GEORGE HERMANN v. HARRY E. CLARK.[1]

April 24, 1903.

Nos. 13,095—(10).

### Contributory Negligence—Assumption of Risk.

> *Held*, in this action brought to recover damages caused by the death of
> plaintiff's son and intestate, first, that the testimony was insufficient to
> justify a finding by the jury that defendant's negligence was the proxi-
> mate cause of the intestate's death; and, second, if this were not true,
> that from the testimony it conclusively appears that he assumed the risk
> of his employment.

Action in the district court for Ramsey county by plaintiff as ad-
ministrator of the estate of Emil Hermann, deceased, to recover
$5,000 for the death of decedent. The case was tried before Otis,
J., who upon the conclusion of plaintiff's testimony, directed a ver-
dict in favor of defendant. From an order denying a motion for
a new trial, plaintiff appealed. Affirmed.

*S. P. Crosby*, for appellant.

*Morton Barrows*, for respondent.

COLLINS, J.

This action was brought to recover damages caused by the death
of plaintiff's son and intestate, who was killed while working for
defendant upon a dredgeboat operating upon the Mississippi river
at the city of St. Paul.

Upon this dredgeboat was a cabin which inclosed a steam boiler,
a main engine, a hoisting engine, a steam and a sand pump; the
latter having two pipes—one, an intake, which received sand at
the bottom of the river, and the other a discharge pipe, through
which it was conveyed to the shore. The shafting which was used
with the sand pump extended through the side of the cabin, about
three feet from the floor of the deck, and upon the end of the
shaft was what is known as a winch head or spool, about eight
inches in diameter, which extended outside the cabin about a foot
and three-quarters. Just beyond this winchhead, and in the deck

[1] Reported in 94 N. W. 436.

floor, were timberheads; one projecting upward about eight inches, and the other about half that distance. Measuring from the end of the winchhead to the top of the largest of these timberheads, the distance was not far from two feet. When the sand pump was in motion, the winchhead ran at a great rate of speed—about three hundred revolutions to the minute. Its surface was smooth, and from the evidence it appears that there was no danger to be apprehended from the catching of clothing thereon. It does not appear that the winchhead was put to any special use, except when it was necessary to move the boat itself; and then the engine was reduced to its lowest rate of speed, and a large rope, an inch and a quarter in diameter, used generally to tie the boat to the shore, was placed about the winchhead three or four times, and then by revolving the same slowly the boat was moved toward the point where the rope was fastened upon the shore. The boat on this particular occasion lay almost at right angles with the current. The large rope before mentioned passed forward alongside the cabin, and from thence to the shore, where it was fastened around a piling. A fuel barge, filled with coal, lay above and close to the boat; and whether its gunwale, a six-inch plank, was on the level with the deck of the boat, or was a few inches below, was in dispute. We do not regard this as material. A three-quarters-inch rope was looped over timberheads upon the forward part of the fuel barge, and, from thence running down to a cleat on the inside of the barge, was fastened to the timberheads before mentioned, on the deck of the dredgeboat. This rope was about sixty feet in length, and seems to have been used for the sole purpose of fastening the barge to the dredge.

The plaintiff, a laborer, engaged as a general utility man about the outfit for six days, had to shovel coal, among other duties, from the fuel barge to the deck of the boat, at a point a few feet distant from the winchhead, and was engaged at this occupation during the morning of the accident, which occurred about 8:30. It was also his duty to coil up and keep in place loose ropes that might be about the boat. This included the coiling of the large rope before mentioned. It was necessary for him, in order to shovel coal from the barge to the proper place on the dredgeboat,

to move the former at times, and this might require the loosening of the three-quarters-inch rope before mentioned; but there was no testimony at the trial tending to show either that the deceased was attempting to move the barge that morning, or that he thought it convenient to do so in order to facilitate the shoveling of coal. When it became necessary for him to move the barge, he loosened the small rope, if obliged so to do, and then pushed the barge along by placing his hands upon the edge of the dredgeboat. If he had loosened the small rope, it then became necessary for him to fasten it again; but this was all done while standing upon the barge, and it was unnecessary for him to go upon the boat for this purpose. It was also shown that only a few minutes before the accident the large rope was properly coiled in front of the cabin, several feet distant from the winchhead.

The sand pump had been running, and as a consequence the winchhead had been revolving rapidly, for more than an hour before the accident. Just how it occurred, no one could tell, for there were no witnesses who could state in what manner the deceased was brought in contact with the winchhead. One witness, Brown, who was about six hundred feet away, said that the man had been caught and was being thrown around the winchhead when he first saw him. This witness expressly refused to say that he saw the man with ropes in his hands, but he did say that both the larger and the small rope and the man were together when the latter was being hurled violently around the head. And it is evident that the ropes were around parts of his body when Brown first discovered that an accident had occurred. Then, in a single instant, the body was thrown to the deck of the boat; one leg and one arm having been torn off, and still hanging, with the ropes, to the winchhead.

That the deceased had been specifically told a day or two before not to attempt to place the large rope around the winchhead at any time was undisputed, so that, if he was attempting this, it was in violation of positive orders. If he was trying to place the small rope around it, he was attempting an act which any man of intelligence would or should know to be extremely dangerous and wholly unnecessary. It was alleged in the complaint that, when

caught, the deceased had the ropes in his hands for the purpose of placing them around the timberheads, which were alleged to be dangerously near the winchhead; but, as before stated, there was no evidence whatever that either of the ropes were in the hands of the deceased. Possibly it might be surmised that, at some time just before he was killed, one or both of these ropes were in his hands; but this fact, and his purpose, if it was so, or how he happened to have hold of them, is entirely problematical. And if we are to surmise and conjecture as to what occurred, we may as reasonably say that the deceased was attempting to place one or both of these ropes around the winchhead, as that he was attempting to place one or both around the timberheads. As it clearly appears that the large rope was coiled in its place just before the accident, it is impossible to suppose that he was using it for any legitimate purpose; and it is equally clear from the testimony that, if he was properly using the small rope (that is, untying it, that he might move the barge), it could not be brought within two or three feet of the winchhead without special effort, unless he was careless. There is absolutely nothing in the case from which it can be fairly inferred that he was making any legitimate use of these ropes, and it is a fair presumption that, if he was, he was not in his place, or where he had been accustomed to use them, when caught.

It must follow from what has been said that there was no testimony to support a finding by the jury that defendant's negligence in maintaining this rapidly revolving winchhead in dangerous proximity to a point where the deceased might have to go in the proper discharge of his duties was the proximate cause of his death. The testimony as to the manner in which this accident occurred was altogether too indefinite and uncertain on this point.

Again, if this were not true, it must be held that the deceased assumed the risk of injury from the winchhead, as incidental to his employment. He was twenty-two years of age—a man of average intelligence. This winchhead contained no latent or concealed defects, and there were no dangers which he could not apprehend. It had been rapidly revolving in his immediate presence during working hours for six days prior to that on which the accident

occurred. In the exercise of common observation, any man of ordinary intelligence would completely understand and appreciate the situation, and the risks incident to the rapid rotary motion. Everything connected with it would be perfectly patent to his senses. He certainly would appreciate and understand the danger of coming in contact with it, or of permitting himself, either with or without ropes in his hands, to get so close to it that he might get caught. If this be so, there can be but one answer to the assertion that he was chargeable with knowledge of the dangers of the place in which he worked, arising out of the fact that the winchhead was rapidly revolving, and that he assumed the risk.

Our attention has been called to G. S. 1894, § 2248, and it is asserted by counsel for the plaintiff that this statute applies to the case, while, upon the other hand, it is contended that it has no application to machinery situated, as this was, upon a dredgeboat. Whether it applies or not is not material, because we have frequently held that this statute does not change the rules of law as to the assumption of risk. See Lally v. Crookston Lumber Co., 82 Minn. 407, 85 N. W. 157.

Order affirmed.