RALPH SYVERSON v. CLIFFORD H. NELSON.[1]

June 3, 1955.

No. 36,560.

---

[1]Reported in 70 N. W. (2d) 880.

*Dell & McCarten,* for appellant.
*Field, Arvesen & Donoho,* for respondent.

NELSON, JUSTICE.

This is an action in tort by plaintiff, Ralph Syverson, to recover for personal injuries suffered May 21, 1953, while working on the farm of the defendant, Clifford H. Nelson, the injuries allegedly caused by the negligence of defendant-employer. Upon the completion of plaintiff's evidence, defendant moved for a directed verdict on the ground that there had been an assumption of the risk involved by the plaintiff and that this appeared conclusively from plaintiff's own evidence. The court granted defendant's motion for a directed verdict, and plaintiff thereafter moved the court to set aside the verdict and to grant a new trial. The motion was denied and judgment entered. Plaintiff appeals from the judgment.

Plaintiff is himself a farm owner, 41 years of age at the time of trial, who at one time operated his own farm. After that he worked for others and came to work for the defendant as a farm hand approximately a year and a half before the alleged accident occurred. During this time he and his family lived on defendant's farm. Outside of fieldwork, he did chores as a part of his daily duties which required that he spend a considerable time about the barn bringing in some 35 cows, milking by use of a milking machine, and turning them out.

When the cows entered the barn they were lined up in their stanchions so as to face each other, there being a center aisle between the two rows and the barn floor sloping from the high point in the center to the gutter along the wall back of each row of cows. The gutters had no drain to the outside and any water accumulating on the floor and draining into the gutters had to be scooped out. The barn was cleaned of litter by use of a carrier which plaintiff pushed to the outside.

There was a water tank in the barn loft which fed water into the drinking cups for the cows in the barn. This water was pumped into

the tank by an electric pump and if too much water got into the tank it would overflow, running through an overflow pipe several feet downward into a five-gallon pail on the floor below. Water running into this pail gave warning that the tank was overflowing. If the pail became full and the tank continued to overflow because of a failure to shut off the water, the overflow water would run onto the floor, down the slope, and into the gutter on the north side.

This arrangement in the barn had remained the same during the period plaintiff worked for defendant. He knew all about the system since he was in daily contact with it. He knew the water system because he operated it from time to time. He had observed the overflow going into the pail a good many times. He testified that you could hear the water running in the pail if you were around when there was an overflow and that this was the warning for turning off the pump. He said that, if he was around, he would turn the pump on; if the tank got full and wasn't turned off before that occurred, then whoever was around the barn would turn the water off. Sometimes he would do it, and at other times someone else would do it. He had done this many times on other occasions when it had overflowed.

On the day the accident occurred, plaintiff had been away during the day and returned to defendant's farm about three o'clock in the afternoon. He did not work any particular hours; he was more or less his own boss. He went to the barn to see if the defendant had turned the cows out, it being his purpose to turn them out if this had not been done. There was no water in front of him when he entered, but going inside he heard water running and he received this warning before he saw any water. He testified that he then knew what that meant since he had heard it before; that it was not the first time an overflow had occurred. He said that those things happen on a farm and they happened on this farm. He also testified that he knew what to do when it did happen and that it was part of his job as a farm hand to take care of it. He went to the pump and turned it off. There was no water there. He then went to the edge of a partition where he could see the slope of the floor, the pail, and the water. He said that he was not surprised by what he saw; that

he had been familiar with the situation and knew what to do to take care of it; and that the first thing to do after turning off the pump was to empty the pail. This he had done before under similar circumstances. He went over to pick up the pail and in doing so he fell, receiving the injuries of which he complains.

Plaintiff testified that the tank had never overflowed to the extent that it did on this occasion; that the gutter had never before flooded causing water to back up onto the cement floor. He testified that he had never before slipped on this barn floor because of water overflowing from the tank. The testimony is to the effect that there was no defect in the cement floor and no foreign matter outside of the water which had overflowed causing the unusual situation. The unusual situation of which he complains was the amount of overflow from the catch pail on this occasion, which was more than had overflowed at any time before. He admitted on questioning by defendant's counsel that after shutting off the water and viewing the situation he proceeded to empty the pail and that is when he fell down and was hurt; that there was not anything there at that time with which he was not fully familiar nor was there anything there that he had not encountered before, except that the overflow of water was greater.

The plaintiff contends that (1) the court erred in granting the defendant's motion for a directed verdict, (2) the court erred in denying plaintiff's motion for a new trial, and (3) the judgment is contrary to law. Plaintiff contends that the judgment cannot stand for it is wholly based on plaintiff's assumption of the risk involved; that the evidence upon which this action is based is of such character as to make assumption of risk a jury question. Plaintiff further contends that the condition that existed at the time of the accident constituted an extraordinary risk from the standpoint of plaintiff's approach to the situation; that it was not a normal one or one usually incidental to his employment; that it could have been obviated by exercise of reasonable care on the master's part; and that the master's negligence in failing to turn off the water before it overflowed was such negligent act as proximately caused the accident and the resulting injuries to the plaintiff.

Defendant takes the position that the plaintiff over the period of a year and a half had gained full knowledge of all conditions which he encountered in the performance of the daily chores and assumed the attendant hazards and risks involved in the situation presented by the evidence in the case. The defendant further argues that all the facts were plainly open to observation and were known by the plaintiff; that the work about to be done was of the most ordinary character; and that therefore the plaintiff assumed whatever hazards were involved. Furthermore, that, if the servant can see and appreciate the danger as well as the master could if he were present, then the servant assumes the risk.

The legal issue involved is whether the evidence here was such as to justify a directed verdict on the ground of assumption of risk.

The trend of the majority of the decisions in the country involving assumption of risk is ordinarily to leave determination of knowledge of dangerous conditions, appreciation of risk, and willingness to assume or acquiescence therein to the jury.

This court has quite uniformly applied the rule that: "Whether a servant assumed the risk is a question for the jury, unless the evidence is conclusive."

The evidence in the instant case does not disclose any hidden defect of which the master had knowledge and the servant did not. Both had operated the water system connected with the barn, depending upon who was present. Plaintiff was experienced as a farmer on his own and as a farm hand working for others. The system of using an overflow pipe and a pail to catch the overflow water gave the same identical warning to whoever might be present and it meant only one thing, namely, sufficient water had been furnished by the operation of the electric pump and it was time to turn it off. Both employer and employee knew what would happen if the pump continued after the overflow pipe had filled the pail, a simple arrangement installed as a warning and protection against threatened overflow. If it overflowed, the water would first flow down the slope to the gutter; and if it continued into the gutter, which was without a drain, it would gradually rise up the slope onto the cement

floor causing it to become wet and slippery in the area surrounding the pail.

The plaintiff had worked around the employer's barn for the entire period he had been there—brought in the cows, turned them out, and scooped and cleaned out the gutter, all of which must of necessity have involved wet and slippery floors somewhere daily within the barn area. The situation one day may have been extraordinary when compared with the situation another day, depending upon the presence of someone to turn off the water system and on whether the cows were kept in the barn stanchions for longer or shorter daily periods due to altered circumstances or the weather.

No machinery was involved in the accident. The situation involved only the pump turnoff valve or switch, the pail connected with the overflow pipe, and water on the cement barn floor which the plaintiff says was plainly obvious.

Knowledge of the physical characteristics of common substances come to all men of average intelligence in the ordinary course of life. Some of these are that fire will burn; that water will drown; that water makes a floor slippery; and that a human being is liable to slip and fall in slippery places. McGowan v. La Plata Min. & Smelting Co. (C. C. D. Colo.) 9 F. 861; 23 Minn. L. Rev. 650.

If the servant can see and appreciate the danger as well as the master, he assumes the risk. It is the general rule that a person engaging in any employment assumes the obvious risks ordinarily incident to it. It is different, however, where a defective appliance is furnished. If a servant is ignorant of the defects, and justifiably so, there can be no assumption of risk. In Liberty Mut. Ins. Co. v. G. N. Ry. Co. 174 Minn. 466, 219 N. W. 755, this court held that, where a defective appliance is furnished, it cannot be held as a matter of law that the servant assumed the risk of an attempt to use it unless it appears that he knew the danger and ought to have understood and appreciated the risk.

Under the doctrine of assumption of risk as applied in this state, a servant assumes not only the risks incident to the employment in which he is engaged, but also such extraordinary risks as he may

knowingly and voluntarily encounter. The danger must, however, be known or plainly observable by him. The measure of the servant's duty is that of ordinary observation. It is not the duty of the servant to exercise ordinary or reasonable care to discover dangers not obvious to ordinary observation. Rase v. Minneapolis, St. P. & S. S. M. Ry. Co. 107 Minn. 260, 120 N. W. 360, 21 L.R.A.(N.S.) 138.[2]

In the Rase case, plaintiff was a coal shoveler at an elevator. He was also in charge of an engine operating it, and went into a small engine house to remedy something which he said "didn't sound right." In so doing he stumbled and fell, according to his contention, on an unguarded belt and revolving pulley and was hurt. He sued to recover damages. The trial court directed a verdict for defendant. This court reversed and held that there plaintiff's assumption of the risk was for the jury.

In Scharenbroich v. St. Cloud Fiber-Ware Co. 59 Minn. 116, 60 N. W. 1093, plaintiff was employed in a pulp mill where the power to operate the machinery was furnished by a water wheel under a small annex to the mill. This wheel was connected with the machinery by a horizontal shaft running under the floor of the annex. There was a pinion on the end of the shaft connected with a cog wheel under the floor, the pinion placed in a hole cut in the floor so that it was partly above and partly below the floor. When in operation the pinion, which was unguarded, revolved quite rapidly. There was an open space in the floor of two or three inches beside the pinion. A vertical shaft also came through the floor a few inches from the pinion. This had a lever attached to the upper end for the purpose of turning the water off and on the water wheel. If high water was encountered it would strike the cogs of the wheel below and spray up through the hole in the floor, rendering it wet and somewhat slippery. There were no cleats on the floor against which to brace

[2]On doctrine of assumption of risk, also see Blomberg v. Trupukka, 210 Minn. 523, 299 N. W. 11; Boyer v. Eastern Ry. Co. 87 Minn. 367, 92 N. W. 326; Davison v. Ressler, 128 Minn. 204, 150 N. W. 802; McCutcheon v. Virginia & R. L. Co. 114 Minn. 226, 130 N. W. 1023; Petra v. Crookston Lbr. Co. 128 Minn. 479, 151 N. W. 183; 11 Dunnell, Dig. (3 ed.) §§ 5932, 5933, and 5964 to 5998, and collected cases.

the feet while turning the lever. In the course of his duties, the plaintiff was sent to turn off the water for the purpose of putting a belt on the "barker." In turning the water on again, it sprayed through the opening onto the floor above because of its height underneath. It was hard to turn the lever so he shifted his position and while he was turning the lever, his foot slipped and came in contact with the pinion which had always remained unguarded. His foot was drawn down and he was injured. The plaintiff claimed the defendant was negligent in not boxing over the pinion and in neglecting to warn him of the danger. The defendant maintained that whatever danger there was in letting on the water or shutting it off was obvious; that plaintiff assumed the risk by entering into or continuing in the employment without complaint; and that the injury he received was the result of his own negligence and want of care in hoisting the gate and turning on the water. The trial court submitted these questions to the jury. Plaintiff had a verdict and defendant appealed. Mr. Justice Mitchell, speaking for this court, said (59 Minn. 121, 60 N. W. 1094):

"Had the case turned exclusively upon the question whether the defendant was negligent in leaving this pinion unguarded, the case would undoubtedly have been one for the jury."

The court held that it was conclusively shown by the evidence that the servant not only knew the exact character and condition of the appliances furnished him by his master but also understood, or by the exercise of common observation ought to have understood, the risks to which he was exposed by their use. He was therefore deemed under all the circumstances to have voluntarily assumed the risks. In reversing and holding that plaintiff assumed the risk in that case as a matter of law, Mr. Justice Mitchell said (59 Minn. 121, 60 N. W. 1094):

"The question here, however, is whether, upon the facts, the plaintiff must be deemed to have voluntarily assumed all the risks incident to the use of the machinery in the condition in which it was, or whether that also was a question for the jury. It is thoroughly established in the law that a servant does not necessarily assume

the risks incident to the use of unsafe machinery because he knows its character and condition. He must also have understood, or by the exercise of ordinary observation ought to have understood, the risks to which he is exposed by its use. In this case it is undisputed that the plaintiff knew the exact nature of the situation. * * *

"It is impossible to conceive of anything which any one could have told him, about either the situation or the risks incident to it, which was not perfectly patent to the senses, in the exercise of common observation by an adult of ordinary intelligence.

"The doctrine of the voluntary assumption of risks by a servant is, for manifest reasons, not especially favored by the courts, and ought to be very cautiously applied.

"But the doctrine is firmly established in the law, and, if it is to be applied in any case, we think it must be held applicable to the facts of this case."

We agree that the doctrine of the voluntary assumption of risk by a servant is one which ought to be very cautiously applied. Unless the evidence is conclusive, it is for the jury. In Rase v. Minneapolis, St. P. & S. S. M. Ry. Co. 107 Minn. 260, 120 N. W. 360, 21 L.R.A. (N.S.) 138, Mr. Justice Jaggard of this court, in a most exhaustive treatment of the doctrine of assumption of risk and the question of whether it is a separate and distinct defense from contributory negligence, refers to the Scharenbroich case relative to when the question of assumption of risk is for the jury and when the risk, depending upon circumstances, may be one of law for the court. Reference is also made to the case of Busch v. Robinson, 46 Ore. 539, 81 P. 237, a case in which plaintiff slipped and fell and was injured by being caught in machinery due to the fact that a board on a platform on which the plaintiff was compelled to stand while doing her work was negligently allowed to become defective. The Oregon court held that assumption of risk in that case was for the jury. He then by comparison cites the Scharenbroich case, with others, commenting that a different element is introduced when the floor on which the plaintiff slipped is to his knowledge wet and slippery; that ordinarily then the risk is assumed. The Scharen-

broich case has been cited with approval in the following cases: O'Niel v. G. N. Ry. Co. 80 Minn. 27, 82 N. W. 1086, 51 L. R. A. 532; Lally v. Crookston Lbr. Co. 82 Minn. 407, 85 N. W. 157; Johnson v. Mac Leod, 111 Minn. 479, 127 N. W. 497, 1120; Outcelt v. Chicago, B. & Q. R. Co. 150 Minn. 398, 185 N. W. 495.

In Lally v. Crookston Lbr. Co. *supra,* this court said that the law of assumption of risk has become well settled in the decisions of this court, and it is only necessary to refer to some of them. This court has constantly followed the rule that the true test in assumption of risk is not in the exercise of care to discover defects, but whether the defect is known to or plainly observable by the employee. Rase v. Minneapolis, St. P. & S. S. M. Ry. Co. *supra;* Scharenbroich v. St. Cloud Fiber-Ware Co. *supra;* Choctaw, O. & G. R. Co. v. McDade, 191 U. S. 64, 24 S. Ct. 24, 48 L. ed. 96.

The evidence in the case at bar is clear that there had been frequent overflow of the catch pail attached to the overflow pipe and that the gutter had frequently become flooded as a result. Plaintiff contends, however, that the overflow on the occasion of the injury was extraordinary in that on this occasion it rose to the high point where the catch pail was located and caused the cement floor to become wet and slippery where he had to walk or step in order to empty the pail. He admits that he was aware of all this. The evidence would indicate that it was as evident to him as it would have been to the master or to anyone else.

Taking all fact situations into account as disclosed by the evidence, it appears quite conclusively that the plaintiff knew of the existence of the facts which created the danger; that he fully appreciated the nature and extent of the particular risk created at the time, which, on his own testimony, was observable; and that he acquiesced and willingly, on his own, assumed the risk.

We conclude that the facts herein support the trial court's determination that plaintiff assumed the risk as a matter of law.

Affirmed.

Mr. Chief Justice Dell took no part in the consideration or decision of this case.