# WILLIAM HACKER v. STANTON BERKNER AND ANOTHER.

## 117 N. W. (2d) 13.

### July 27, 1962—No. 38,511.

*Carl A. Jensen,* for appellant.

*Gislason, Reim, Alsop & Dosland* and *John F. Corbey,* for respondents.

NELSON, JUSTICE.

Plaintiff, William Hacker, appealed from an order of the district court granting the motion of defendants, Stanton and Tekla Berkner, for judgment notwithstanding the verdict in an action brought to recover for injuries plaintiff sustained while grinding feed on defendants' farm.

To supply power to the hammermill used for grinding the feed, plaintiff had coupled it to a tractor with a power takeoff. How the accident occurred may be illustrated by his testimony—

"Q. * * * Now, on May 2, 1959, did you have an accident with some machinery on the Stanton Berkner farm?

"A. Yes, the hammermill.

"Q. Would you state how that accident occurred?

"A. I was grinding feed and I looked out by the corn-crib and the pole unhooked between the tractor and the hammermill, bolts fell out, and I tried to get out in a hurry so I wouldn't break nothing else.

"Q. Then the hammermill and the tractor were running and it was grinding feed?

"A. Yes.

"Q. Where were you?

"A. In the corn-crib shoveling corn.

"Q. Then you say you looked out and you saw, you said what, what disconnected?

"A. Disconnected from the tractor, the hammermill.

"Q. Was it the power take-off that disconnected or was it the other?

"A. Just disconnected from the hole that hooked onto the tractor; the hammermill wasn't disconnected, not the power shaft.

"Q. Had this ever happened before?

"A. No, not that I know of.

"Q. How far were you from the tractor when you first noticed this?

"A. Oh, must have been about six or seven feet.

"Q. I see, and you went right over and how did you try to correct this situation?

"A. See, I jumped out and I reached over the power take-off and when I reached over the bolt must have caught my shoulder and she throwed me right over.

"Q. Where was this bolt that caught you?

"A. That was on the power shaft right up on the tractor.

"Q. On the connection from the power take-off from the tractor to the power connection of the hammermill?

"A. Yes.

"Q. Now, was there a shield or a guard on the tractor?

"A. No, no shield or anything on it.

"Q. When you came to work there in 1955 was there a guard or shield on this?

"A. No, there wasn't ever.

"Q. While you were there there was never a shield on there?

"A. No.

"Q. So the power take-off and the connection with the hammermill to that was completely exposed, is that correct?

"A. Yes.

"Q. Now, you said that you reached over and it caught you. What did it do to you?

"A. Throwed me across the power shaft, over across the ground.

"Q. It picked you up and threw you over on the other side?

"A. Yes.

"Q. What did it do?

"A. It just ripped all my clothes off. Then I got up and shut the

tractor down. I didn't know my arm was broke; looked down at my arm and tried to wiggle it and one hand was hanging one way and the arm the other way and that was the first I knew the arm was broke.

* * * * *

"Q. * * * Now, you stated—did you state that you reached over, that you did this in a hurry?

"A. Yes, I reached over in a hurry and didn't figure it was dangerous that I get caught.

"Q. Why were you in a hurry?

"A. Because I was figuring on getting done with it.

"Q. Was there any change, any danger to the machinery if it was left that way?

"A. The way it was laying on the ground?

"Q. Yes.

"A. I figured it might bust some of the nuts.

"Q. That was the reason?

"A. That was the reason I jumped—"

Plaintiff was born on a farm and attended school through fourth grade. He worked on a number of farms for a period exceeding 30 years and became acquainted with all kinds of farm machinery, including tractors with power takeoffs. Plaintiff admitted at the trial that there was nothing that defendants could have told him about using the machine that he did not already know. His duties for various employers over the years included operation and maintenance of power takeoffs and he was familiar with almost every kind used on tractors. His testimony indicates also that he had operated every kind of farm machinery operated with a power takeoff.

Plaintiff had been employed by defendants for approximately 5 years when the accident in which he was injured occurred. During this period he was the only person who used the hammermill and had used the same tractor with it to grind feed two or three times a week. He admitted that the hammermill was in good condition and had no defects. The hammermill was secured to the rear hitch of the tractor by a bolt which had a hole in it so that it could be secured by a cotter pin. Although a cotter pin or wire could easily have been put through

the hole in the bolt to keep it in place, this was not done, and plaintiff testified that he was hurrying when the accident occurred and did not think that the bolt would jump out of place.

When the tractor was purchased it had a guard attached to cover the power takeoff. Whether this guard was on at the time of the injury is in dispute. Plaintiff, about a year before this occurrence, had been similarly caught in a power takeoff causing his trousers to be ripped off. He had been warned many times about the dangerous character of the power takeoff. He admitted that he would have been aware of such dangers if he had thought about it and also that he knew of two ways to stop the power takeoff without exposing himself to danger. He testified, however, that he did not think of them when he attempted to fix the connection because he was hurrying to prevent damage to the hammermill.

On cross-examination plaintiff, after being questioned about the earlier accident, testified as follows:

"Q. Mr. Hacker, is there anything or was there anything about this power take-off and all of the things that went along with it as it turned there that you didn't know?

"A. Well, everything turned.

"Q. You knew it, didn't you?

"A. Yes.

"Q. You knew where the switch was to turn the tractor off, didn't you?

"A. But I never figured that far because when I jumped out of the corn crib I tried to save the mill; I didn't try to shut the switch off the tractor.

"Q. I understand that but you knew where it was, didn't you?

"A. Sure, I knew where it was.

"Q. You knew that you could get caught in a power take-off, didn't you?

"A. Not in that short time when I jumped out of the crib.

"Q. It had happened to you before, with your own clothes?

"A. I didn't figure that far right away.

"Q. Was there anything that Mrs. Berkner or Mr. Berkner could have told you about that machine that you didn't know?

"A. I will say no."

Following the accident plaintiff was hospitalized for 2 weeks with a broken wrist and broken ribs. His doctor testified that in his opinion plaintiff has sustained a permanent disability of approximately 25 percent to his forearm and wrist.

At the close of the testimony defendants moved for a directed verdict and a dismissal of the action. The court denied the motion, and the jury returned a verdict of $1,265 in plaintiff's favor. Defendants thereafter moved for judgment notwithstanding the verdict and plaintiff has appealed from the order granting that motion.

In a memorandum made a part of the order granting the motion for judgment notwithstanding the verdict, the trial court said:

"From a point of view most favorable to the plaintiff, the evidence shows that the part of the machine that caused the injury to plaintiff was a simple power take-off shaft, through which there was a bolt with a nut on it; that the shaft was turning; that plaintiff reached over it in such a way that the bolt caught his clothing and caused the injury.

"Plaintiff was thoroughly acquainted with the machine. He alone had used it for five years. He had worked on farms all his life and with tractors for thirty years. Less than a year before the accident, he had had his clothes caught in a power take-off. The dangers were as open and obvious to him as they were to his employers; in fact, he testified that there was nothing they could have told him about the machine that he did not know. * * *

"Plaintiff claims that he was confronted with an emergency. The emergency, if there was one, came about because the bolt plaintiff had used to couple the two machines together, shook loose and permitted them to come apart. The bolt was so made that it could be secured in place by the use of a cotter key, a nail or a piece of wire. Plaintiff knew of that fact, but chose to ignore the danger and took no precaution to secure the bolt. He alone was at fault, and he cannot claim the benefit of the emergency rule. Dunnell Digest, Sec. 7020 and cases cited."

The issue raised by this appeal is whether the evidence was such as to justify the trial court in granting judgment notwithstanding the verdict on the ground of assumption of risk.

■ This court has said that while assumption of risk is not a defense which appeals to the sense of justice of the ordinary person it is, nevertheless, the law where not abrogated by statute. Jurovich v. Interstate Iron Co. 181 Minn. 588, 233 N. W. 465. The defense is but a phase of contributory negligence and is properly included within the scope of that term. Graybow v. Hanson, 226 Minn. 265, 32 N. W. (2d) 593.

We have said that assumption of risk is to be distinguished from contributory negligence in that notice or knowledge and appreciation of danger are indispensable to the former, while contributory negligence is based on carelessness. The elements entering into contributory negligence are want of ordinary care on the part of the person injured and a causal connection between his conduct and the accident. Olson v. Hector Const. Co. Inc. 216 Minn. 432, 13 N. W. (2d) 35. In addition assumption of risk must be voluntary, and in that respect also, it is distinguishable from contributory negligence. Donald v. Moses, 254 Minn. 186, 94 N. W. (2d) 255; Schrader v. Kriesel, 232 Minn. 238, 45 N. W. (2d) 395. Where a party has two ways in which to do an act, and knows that one is safe and the other dangerous, and he elects the dangerous one, he is guilty of contributory negligence as a matter of law because the choice involves an unreasonable exposure to risk of injury. Huyink v. Hart Publications, Inc. 212 Minn. 87, 2 N. W. (2d) 552. Where a party places himself in a position to encounter known hazards which the ordinarily prudent person would not do, he assumes the risk of injury therefrom. Graybow v. Hanson, *supra*.

■ It is the general rule that a person engaging in any employment assumes the obvious risks ordinarily incident to it. Of course, if a servant is ignorant of the defects in equipment furnished him, and justifiably so, there can be no assumption of risk. Geis v. Hodgman, 255 Minn. 1, 97 N. W. (2d) 311; Syverson v. Nelson, 245 Minn. 63, 70 N. W. (2d) 880.

■ Under the doctrine of assumption of risk as applied in this state a servant also assumes such extraordinary risks incident to his employment as he may knowingly and voluntarily encounter. The danger, however, must be known or plainly observable by him. The measure of the servant's duty is that of ordinary observation. Syverson v. Nelson, *supra*.

■ It is not his duty, however, to exercise ordinary or reasonable care to discover dangers not obvious to ordinary observation. This court has consistently followed the rule that the true test with regard to assumption of risk is not whether there has been exercise of care to discover defects but whether the defect is known to, or plainly observable by, the employee. Syverson v. Nelson, *supra,* and cases therein cited.

The rule followed in this state was clearly established in Scharenbroich v. St. Cloud Fiber-Ware Co. 59 Minn. 116, 60 N. W. 1093. In that case plaintiff had been employed in a pulp mill in which the power to operate machinery was furnished by a water wheel under a small annex to the mill. The wheel was connected to the machinery by a horizontal shaft running under the floor of the annex. There was a pinion on the end of the shaft connected with a cogwheel under the floor, the pinion having been placed in a hole cut in the floor so it was partly above and partly below the floor. When in operation the unguarded pinion revolved quite rapidly. There was an open space in the floor of 2 or 3 inches beside it. A vertical shaft which had a lever attached to the upper end for turning the water off and on the water wheel also came through the floor a few inches from the pinion. A person turning the lever usually did so from a position which left the upright shaft between him and the pinion. In the course of his duties plaintiff was sent to turn off the water. When he had turned it partly on again, it sprayed through the opening onto the floor. The lever was hard to turn so plaintiff shifted his position and while he was turning the lever his foot slipped and came in contact with the pinion. As a result his foot was drawn down between the pinion and the floor and he was hurt. Plaintiff claimed negligence on the part of defendant in not boxing over the pinion and in neglecting to warn him of the danger. Defendant contended that whatever danger there was

was an obvious one; that plaintiff therefore assumed the risk by entering into or continuing in the employment without complaint; and that his injury was the result of his own negligence. This court held that plaintiff had assumed the risk involved as a matter of law. Mr. Justice Mitchell spoke for the court (59 Minn. 121, 60 N. W. 1094):

"Had the case turned exclusively upon the question whether the defendant was negligent in leaving this pinion unguarded, the case would undoubtedly have been one for the jury.

"The question here, however, is whether, upon the facts, the plaintiff must be deemed to have voluntarily assumed all the risks incident to the use of the machinery in the condition in which it was, or whether that also was a question for the jury. It is thoroughly established in the law that a servant does not necessarily assume the risks incident to the use of unsafe machinery because he knows its character and condition. He must also have understood, or by the exercise of ordinary observation ought to have understood, the risks to which he is exposed by its use. In this case it is undisputed that the plaintiff knew the exact nature of the situation. * * *

"It is impossible to conceive of anything which anyone could have told him, about either the situation or the risks incident to it, which was not perfectly patent to the senses, in the exercise of common observation by an adult of ordinary intelligence.

"The doctrine of the voluntary assumption of risks by a servant is, for manifest reasons, not especially favored by the courts, and ought to be very cautiously applied.

"But the doctrine is firmly established in the law, and, if it is to be applied in any case, we think it must be held applicable to the facts of this case."

■ This court has quite uniformly applied the rule that whether a servant assumed the risk of a given situation is a question for the jury unless the evidence is conclusive. Geis v. Hodgman, *supra*. In this case it has that character.

The facts do not disclose any hidden defects in the machinery of which the master had knowledge and the servant did not. Plaintiff had many years of experience as a farmhand, and the testimony

shows that he had at all times operated the power takeoff hooked to the hammermill under the same conditions as those existing on the day of the accident. It establishes also that he knew two methods of stopping the feed-grinding process without endangering himself. He deliberately chose to face known hazards in order to take a shortcut. We have a situation here where the servant could see and appreciate the danger as well as the master could.

■ Plaintiff himself testified that he knew "about all there is to know about power machinery on a farm" and realized that a power takeoff while in operation was dangerous. In view of his similar experience with the power takeoff in the preceding year, it is difficult to conceive how the danger that existed under the circumstances could have been more forcibly brought home to plaintiff. The method he chose to replace the bolt and couple the machines was by far the most dangerous of all the methods available and known to him, the danger involved in his actions being obvious to him under the circumstances and to no one else. If the servant as well as the master can see and appreciate the danger, the servant assumes the risk as a matter of law. Liptak v. Karsner, 208 Minn. 168, 293 N. W. 612.

We held in the Liptak case that where the danger, if any, is obvious to the sense of ordinary intelligence, discernible and open to the employee, the employer is under no duty to instruct or warn concerning it, and that where a condition of danger is obvious, known to, and appreciated by the employee, and he continues work without protest, the risk of danger is assumed by him. See, Rozinka v. Duluth & I. R. R. Co. 181 Minn. 20, 231 N. W. 404; Palmer v. Wiltse, 239 Minn. 130, 57 N. W. (2d) 812; Hermann v. Clark, 89 Minn. 132, 94 N. W. 436; Anderson v. C. N. Nelson Lbr. Co. 67 Minn. 79, 69 N. W. 630.[1]

---

[1]Other jurisdictions under facts similar to those in the instant case have held that the servant assumes the risk if the danger is obvious to an ordinarily prudent person even though the master is negligent. Hopper v. Gallant, 46 Wash. (2d) 552, 282 P. (2d) 1049; Blanco v. Sun Ranches, Inc. 38 Wash. (2d) 894, 234 P. (2d) 499, 235 P. (2d) 830; Schmeling v. Jorgensen, 77 S. D. 8, 84 N. W. (2d) 558. See, Restatement, Agency (2 ed.) § 521; 35 Am. Jur., Master and Servant, § 302; 56 C. J. S., Master and

Other contentions of plaintiff require little comment. He contends that the emergency rule applied, but the trial court held that it had no application and we agree. Since plaintiff's own conduct was the sole factor causing him to be placed in a position of obvious danger, he cannot benefit by that rule.

Plaintiff urges the application of Minn. St. 182.01 to 182.20, the so-called Factory Act. In Dahlen v. Polinsky, 195 Minn. 470, 475, 263 N. W. 602, 604, we rejected its application to domestic servants and said:

"* * * It cannot even be supposed that the legislature ever intended that § 4147 [now Minn. St. 182.07] was to be construed so as to apply to domestic servants. If it did, it also must apply to farm workers. * * * From a reading of the previous legislative acts relative to the protection of employes, * * * we are convinced that it was not intended that it should so apply."

Thus, as we have previously construed the statute, farm workers are not protected by the provisions of c. 182 relating to equipment in places of employment. Their inclusion is a legislative function.

From the record as a whole it appears quite conclusively that plaintiff knew of the existence of all the circumstances which created the danger; that these were as obvious to him as to defendants; that he fully appreciated the nature and extent of the particular risk, which by his own testimony was observable and known to him; and that he personally and voluntarily assumed such risk.

We conclude that the record amply supports the trial court's determination that plaintiff assumed the risk as a matter of law and that the trial court was therefore justified in granting judgment notwithstanding the verdict.

Affirmed.

---

Servant, § 393. See also the excellent annotation in 67 A. L. R. (2d) 1120 on liability of a master to a servant injured by farm machinery.