**Josephine GOODWIN, Appellant,**

v.

**LEGIONVILLE SCHOOL SAFETY PATROL TRAINING CENTER, INC., Respondent,**

v.

**GRANDE VOITURES DU MINNESOTA, LA SOCIETE DES QUARANTE HOMMES, ET HUIT CHEVAUX, Respondent.**

No. C9–87–1722.

Court of Appeals of Minnesota.

April 19, 1988.

Review Denied June 23, 1988.

OPINION

MULALLY, Judge.

Appellant Josephine Goodwin appeals from an order, dated July 27, 1987, denying her motion for a new trial. At the close of all the evidence, the trial court directed a verdict in favor of the respondents, Legionville School Safety Patrol Training Center, Inc. (hereinafter referred to as Legionville) and Grande Voitures Du Minnesota, La Societe Des Quarante Hommes, et Huit Chevaux (hereinafter 40 & 8). Findings of facts, conclusions of law and order for judgment were entered on June 26, 1987. A motion for a new trial pursuant to Minn. R.Civ.P. 59.01(7) contended that the trial court's decision was not justified by the evidence and was contrary to law. Goodwin alleges that the trial court was in error in granting a directed verdict because the evidence was not sufficient. Goodwin also contends that the trial court erred in holding that as a matter of law, primary assumption of risk applied to this case and barred Goodwin's claim. Respondent Legionville has filed a notice of review alleging that as a matter of law, they owed no duty to appellant.

FACTS

Appellant commenced an action against Legionville School Safety Patrol Training Center arising out of injuries which she sustained in a fall from the roof of a dining hall at the Legionville School Safety Patrol Training Center on May 22, 1982. Legionville later brought an action against 40 & 8, alleging that its liability is secondary to 40 & 8 or in the alternative, that Legionville is entitled to indemnity against 40 & 8 if found liable.

Legionville is a nonprofit corporation which holds training sessions at its lakefront property each summer for school crossing guards. While Legionville is affiliated with the American Legion, technically it is a separate entity. 40 & 8 is an unincorporated association composed exclusively of American Legion members and is an honorary society of the American Legion.

William P. Kaszynski, St. Paul, for appellant.

Thomas L. Thompson, Minneapolis, for respondent.

Heard, considered and decided by NORTON, P.J., and MULALLY and FLEMING,* JJ.

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

Each spring, 40 & 8 has conducted a "work and play weekend," with the permission of Legionville, to do repairs, maintenance and other chores to prepare the campground for the summer sessions. The 40 & 8 members invite their families or friends to the work and play weekend to perform the chores on a voluntary, noncompensatory basis.

Goodwin was invited as a guest of a friend, Dale Buffington, for the work and play weekend of May 21–24, 1982. Goodwin had also attended the work and play weekend in 1981 with Buffington. In 1981, Goodwin and Buffington volunteered to shingle some dormitories at Legionville. The roofing was an ongoing project which took several years to complete. Goodwin had also had experience in roofing her own house. Buffington had helped Goodwin roof her house and had also roofed his own house. The 40 & 8 members were told to bring their own hammers and to wear rubber-soled shoes if they were going to help with roofing.

Goodwin and Buffington arrived at the campground late Friday evening. They missed an organizational meeting which was held earlier. The work commenced the following morning. Approximately 60–90 persons were present for the work and play weekend. Nails and shingles for the project were provided by Legionville. Several people were already working on the mess hall roof when Goodwin began work Saturday morning. While the peak of the dining hall was approximately 12–14 feet above ground, the edge of the roof was 5–6 feet above ground. There was no ladder present since the workers could get onto the roof by first stepping on a concrete pillar.

Fred Fisher, the caretaker of Legionville, periodically checked on workers and made sure that they had enough supplies. The Legionville board had approved the roofing of the dining hall at a meeting held in October of 1981. The board knew that members of 40 & 8 would be doing the work and that these people were non-professional volunteers. The board, as well as anyone who looked at them, knew that the dining hall was higher and steeper than the dormitories which had been shingled in 1981.

Those who were to work on roofs were told to wear rubber-soled shoes. Goodwin was wearing rubber-soled shoes at the time of the accident. Goodwin testified that she was sitting on the roof and reaching for a shingle slightly above her when she slid off the roof. She thinks that grit from the shingles may have caused the roof to become slippery. Goodwin testified that she went up on the roof voluntarily, knowing that all roofs were hazardous and that this particular roof could be hazardous, although it did not seem to be dangerous. Goodwin also testified that she was aware that she could fall off the roof and injure herself. Goodwin also testified that she was familiar with safety precautions which could be used while roofing. She also testified that she had never been on this roof before and that she never thought about placing a board along the edge of the roof as a safety precaution.

A trial by jury was held on June 1 and 2, 1987. The respondents moved for a directed verdict at the close of the appellant's case in chief and at the close of all evidence. The trial court granted the directed verdict. In its findings of facts, the trial court found that:

Prior to May 22, 1982, Plaintiff had had experience in shingling roofs. She had worked on the roof of her own home, installing shingles. She was present at the work and play weekend at Legionville Camp in 1981, at which time she installed shingles on dormitories.
* * * Prior to her injury, she was aware that, "All roofs are hazardous." She knew that the particular roof over the mess hall could be hazardous.

Plaintiff had agreed, of her own volition, to undertake work on the roof of the mess hall. She did not do so in response to the orders of anyone. Her decision to participate in the roofing activities was a voluntary choice on her part.

The particular risk to which Plaintiff was subjected at the time of her injury

was the risk that she might lose traction and fall off of the roof. Before the injury, she had knowledge of this risk, she appreciated the risk, and, although she had a chance to avoid it, she voluntarily chose to chance it.

The trial court made the following conclusions of law:

I. During the work and play weekend of May, 1982, defendant Legionville owed a duty to use reasonable care for plaintiff's safety.

II. However, immediately prior to her injury of May 22, 1982, plaintiff assumed the risk that she might lose traction and fall off the roof. As a result, defendant did not owe plaintiff a duty of due care to protect her from the risk which caused her injury.

III. Plaintiff may not recover from defendant Legionville.

IV. Legionville's claim against 40 & 8 is rendered moot.

Goodwin moved for a new trial on all issues. The trial court denied the motion. Goodwin appeals from the court's order, contending that the trial court erred in applying the doctrine of primary assumption of risk to these facts; and that facts exist upon which a jury could sustain a verdict for the plaintiff.

## ISSUE

Did the trial court err in directing a verdict in favor of Legionville?

## ANALYSIS

A motion for a directed verdict presents only a question of law for the trial court regarding the sufficiency of the evidence to present a fact question for the jury to decide. The test to be applied by the lower court and this court on review is that the motion should be granted only in those unequivocal cases where 1) in the light of the evidence as a whole, it would clearly be the duty of the trial court to set aside a contrary verdict as being manifestly against the entire evidence, or where 2) it would be contrary to the law applicable to the case.

*J.N. Sullivan & Associates, Inc. v. F.D. Chapman Construction Co.,* 304 Minn. 334, 336, 231 N.W.2d 87, 89 (1975). The evidence must be viewed in the light most favorable to the party opposing the motion. *Peterson v. Little–Giant Glencoe Portable Elevator Division of Dynamics Corporation of America,* 366 N.W.2d 111, 115 (Minn.1985).

If there is a fact question presented for jury decision under all of the evidence and the applicable law, the motion should be denied.

*Jacoboski v. Prax,* 290 Minn. 218, 187 N.W. 2d 125, 127 (1971).

The trial court, in its memorandum, which was made part of the order granting a directed verdict in favor of respondent, pointed out that a possessor of land owes to an entrant, such as this appellant, a duty to exercise reasonable care for her safety. *Peterson v. Balach,* 294 Minn. 161, 199 N.W.2d 639 (1972). However, the duty can be negated so as to free a possessor of land from liability by the actions of the entrant (here the appellant) in assuming risks that (1) appellant had knowledge of; (2) appellant appreciated; and (3) appellant had a choice to avoid, but voluntarily chose to chance. *Evanson v. Jerowski,* 308 Minn. 113, 241 N.W.2d 636, 640 (1976). Also, as pointed out by the trial court, in its primary sense, assumption of risk refers to the concept that an appellant's actions can, in fact, negate a duty owed by a respondent. *Armstrong v. Mailand,* 284 N.W.2d 343, 351 (Minn.1979).

In ruling on respondents' motion for a directed verdict, the trial court assumed that all of appellant's evidence was true and drew inferences favorable to her. The trial court went on to find that no fact issues remained for the jury's determination, and that based on appellant's testimony alone, all of the elements of assumption of the risk were present. First, she had knowledge of the risk that she might be injured if she worked on a roof. She testified that all roofs are dangerous and that this one could be. She had done roofing previously, both at Legionville Camp and on her own home. Second, she appreciated

the risk. She knew that she had to wear rubber-soled shoes while working on the roof. The shoes were necessary to give traction to anyone working on a roof so he or she would not slip. Finally, the court found that it was undisputed that she voluntarily chose to become one of those working on the roof of the mess hall, and that to these specific items of undisputed evidence there must be added the conclusion that anyone with ordinary powers of observation and normal common sense could appreciate that there is always a danger of slipping and falling when one works on a roof.

Based upon such findings, the trial court held that as a matter of law primary assumption of risk applied, barring Goodwin's claim. The trial court held that the assumption of risk in the primary sense, negated any other duty of care which the respondents might otherwise have owed to the appellant.

> Taking all fact situations into account as disclosed by the evidence, it appears quite conclusively that the plaintiff knew of the existence of the facts which created the danger; that he fully appreciated the nature and extent of the particular risk created at the time, which, on his own testimony, was observable; and that he acquiesced and willingly, on his own, assumed the risk.

*Syverson v. Nelson,* 245 Minn. 63, 72, 70 N.W.2d 880, 886 (1955).

Here primary assumption of risk is applicable because appellant chose to encounter a well-known incidental risk of roofing; slipping and falling off the roof. "As to those risks, the [respondent] has no duty to protect the [appellant] and, thus, if the [appellant's] injury arises from an incidental risk, the [respondent] is not negligent." *Olson v. Hansen,* 299 Minn. 39, 216 N.W. 2d 124, 127 (1974).

There will be a limited number of cases in which the doctrine of primary assumption of risk applies. There will be an even more limited number of cases in which the evidence is so clear and undisputed as to present no fact issues for the jury to decide, and the actions of the claimant are such as to constitute primary assumption of risk as a matter of law. In our opinion, this is such a case.

## DECISION

The trial court did not err in directing a verdict in favor of respondent Legionville.

Affirmed.

NORTON, J., dissents.

NORTON, Judge (dissenting).

I respectfully dissent. Contrary to the majority's opinion, I do not believe that the doctrine of primary assumption of risk applies to this case. I would remand this case for a jury to decide the negligence of both parties.

Appellant Josephine Goodwin testified at trial that she did not think the roof of the dining hall was dangerous, even though she knew that all roofs could be hazardous. Rather than appreciating and consenting to any risk, Goodwin testified that she never thought about it, nor did she think about taking any precautions.

From testimony given at trial, a jury could have found respondent Legionville negligently supervised its invitees who attended the work and play weekend. The board of Legionville had approved the shingling project. It invited these nonprofessional workers to the camp to do maintenance and other chores to prepare the campground for summer sessions, thus saving Legionville $3000-$4000 per year. The board knew that approximately fifty to one hundred people would be working this weekend. The board knew that the volunteers were nonprofessionals who may have had little or no experience in shingling. The board supplied the shingling materials, but provided no other supplies or safety devices. Legionville had no supervisor present, and left it up to the work and play group to supervise any activity.

Some states, including Minnesota, make a distinction between "primary" and "secondary" assumption of risk. This court has stated that:

> The term "assumption of risk" has two meanings in Minnesota. In its primary

sense it means simply that the defendant owed no duty of care toward the plaintiff and therefore could not be guilty of negligence with respect to him. In its "secondary" sense assumption of risk means simply that the plaintiff was guilty of contributory negligence or fault.

*Swagger v. City of Crystal,* 379 N.W.2d 183, 184 (Minn.Ct.App.1985), *pet. for rev. denied* (Minn. Feb. 19, 1986) (quoting *Pitts v. Electro–Static Finishing, Inc.,* 607 F.2d 799, 801, n. 2 (8th Cir.1979)). The supreme court has defined primary assumption of risk as follows:

> Primary assumption of risk, express or implied, relates to the initial issue of whether a defendant was negligent at all—that is, whether the defendant had any duty to protect the plaintiff from a risk of harm. It is not, therefore, an affirmative defense. * * * The classes of cases involving an implied primary assumption of risk are not many.

*Springrose v. Wilmore,* 292 Minn. 23, 24, 192 N.W.2d 826, 827 (1971).

Primary assumption of risk has not been applied in cases of negligent supervision of invitees. Since the institution of comparative fault in Minnesota, primary assumption of risk has most often been applied to inherently dangerous sporting events. *See Wagner v. Thomas J. Obert Enterprises,* 396 N.W.2d 223 (Minn.1986) (rollerskating); *Swagger,* 379 N.W.2d 183 (softball).

Primary assumption of risk bars a plaintiff's claim because:

> Assumption of risk in this form is really a principle of no duty, or no negligence, and so denies the existence of any underlying cause of action. Without a breach of duty by the defendant, there is thus logically nothing to compare with any misconduct of the plaintiff.

*Prosser & Keeton on the Law of Torts,* § 68, at 496–97 (W. Page Keeton ed. 5th ed. 1984).

Both *Swagger* and *Wagner* follow this reasoning. In *Swagger,* this court reaffirmed that an owner of a ballpark has a limited duty to protect spectators. This duty is fulfilled when the owner provides a choice between sufficiently screened in seats and open seats. There can be no breach of duty or no negligence if a spectator in an open seat is hit by a ball, when management has provided screened in seats. Because there was no negligence by the defendant, primary assumption of risk did not apply. *Swagger,* 379 N.W.2d at 185.

In *Wagner,* the supreme court ruled that the doctrine of primary assumption of risk applied to injuries caused by well known incidental risks of inherently dangerous rollerskating. *Wagner,* 396 N.W.2d at 226. However, the court also ruled that:

> The doctrine of primary assumption of risk does not * * * relieve the rink management of its duty to safely supervise skating activities or to maintain the premises in a safe condition. Negligent maintenance and supervision of a skating rink are not inherent risks of the sport itself.

*Id.*

The majority correctly states that Legionville owed a duty to the work and play guests, including Goodwin. Legionville had a duty to use reasonable care for the safety of their guests. *See Peterson v. Balach,* 294 Minn. 161, 199 N.W.2d 639 (1972). The scope of the duty depends upon several factors:

> Among the factors to be considered might be the circumstances under which the entrant enters the land (licensee or invitee); foreseeability or possibility of harm; duty to inspect, repair, or warn; reasonableness of inspection or repair; and opportunity and ease of repair or correction.

*Id.* at 174 n. 7, 199 N.W.2d at 648 n. 7.

It is clear that Legionville owed a continuing duty to Goodwin for her safety. Legionville invited her onto its land to do maintenance work free of charge. The possibility of harm to one of the volunteer nonprofessional helpers, and specifically to a person working on a roof, was foreseeable. Because Legionville knew volunteers would be shingling, it had a duty to take precautions for these people's safety. This was more than a duty to tell helpers to

wear rubbersoled shoes. It would have been reasonable for Legionville to have a specific person supervise the shingling activity. It would have been reasonable for Legionville to take some safety precautions on its own, such as insisting that a toe board be used. There was an opportunity for such precautions to be used without any difficulty.

Because there was evidence from which a jury could reasonably find that Legionville breached its duty, primary assumption of risk does not apply, and a directed verdict was improper.

The definition and elements of assumption of risk, in both the primary and secondary sense, are correctly stated by the majority. To decide that a person assumed a risk it must be found that 1) she had knowledge of the risk, 2) she appreciated the risk, and 3) she had a choice to avoid the risk or chance it and voluntarily chose to chance it. *Evanson v. Jerowski*, 308 Minn. 113, 118, 241 N.W.2d 636, 640 (1976).

The *Evanson* court explained that:

Basic to the defense [of primary assumption of risk] "is the manifestation of consent to relieve a defendant of the obligation of reasonable conduct.

\* \* \* \* \* \*

It is not every deliberate encountering of a known danger which is reasonably to be interpreted as evidence of such consent. The jaywalker who dashes into the street in the middle of the block, in the path of a stream of cars driven in excess of the speed limit, certainly does not manifest consent that they shall use no care and run him down. On the contrary, he is insisting that they shall take immediate precautions for his safety; and while this is certainly contributory negligence, it is not assumption of the risk. This is undoubtedly the most frequent errors of attorneys, and even of the courts, in dealing with the defense."

*Id.* at 118–119, 241 N.W.2d at 640 (quoting Prosser, *Torts*, § 68 at 450).

There was no showing by Legionville that plaintiff manifested her consent to Legionville's negligent supervision of her safety. By going on the roof at Legionville's invitation and for Legionville's benefit, Goodwin was insisting that Legionville take precautions for her safety.

Similar to the present case is *Rieger v. Zackoski*, 321 N.W.2d 16 (Minn.1982). In *Rieger*, the court found that the defendant Brainerd International Raceways (BIR) negligently supervised its racetrack by allowing a spectator's car to enter the track after the race. *Id.* at 24. The plaintiff was injured when he jumped a fence and entered the racetrack and tried to flag down the spectator's car. *Id.* at 19. Defendant BIR also knew that spectators often jumped the fence and entered the track after the day's races were completed. *Id.* at 22. Defendant BIR had a security force to keep cars off the track at the end of the races, because it was foreseeable that cars on the track could hit spectators. *Id.* at 22. The court found that BIR had a duty to escort plaintiff from the racetrack. *Id.* at 23. Because defendant BIR breached this duty, primary assumption of risk did not apply. *Id.* at 23–24. Plaintiff's secondary assumption of risk was considered under comparative fault. *Id.* at 23–24. *See* Minn.Stat. § 604.01 (1986).

In the present case, Legionville had a duty of reasonable care for Goodwin's safety. This duty included supervising the work and play guests; and specifically taking precautions for the roofers' safety. Providing a supervisor and a toe board would have been reasonable precautions to fulfill this duty. Because Legionville breached its duty, primary assumption of risk cannot apply to this case. Legionville's duty and breach of duty cannot be negated by Goodwin's negligence for her own safety. This is the type of situation which is considered to be secondary assumption of risk and should be evaluated under comparative fault. *See Isker v. Gardner*, 360 N.W.2d 468 (Minn.Ct.App. 1985) *pet. for rev. denied* (Minn. Apr. 15, 1985).

I would remand this case so that both parties' negligence could be considered by a jury.