## SUSANNA KLAGES v. GILLETTE-HERZOG MANUFACTURING COMPANY.[1]

June 20, 1902.

Nos. 12,999—(131).

**Respondeat Superior.**

Whether the doctrine of respondeat superior applies to any particular case between the original contractor and a subcontractor is determined by the contract between the parties with reference to the right of the former to control or direct the latter as to the time, place, and manner of performing the work.

**Contractor and Subcontractor—Written Agreement.**

The true relation of the parties in this respect is prima facie as expressed by the terms of the written contract, if there be one. But such contract is to be considered in view of the circumstances under which it was made and the manner in which the work was performed. If it appears that the writing was not executed in good faith to express the real relation of the parties, or if it appears that, notwithstanding such contract, supervision or control of the work was assumed by the original contractor, then the application of the rule is to be determined by the conduct of the parties.

**Death from Electricity.**

Test applied in an action where appellant's husband was killed by an electric shock, caused by the cables of a derrick coming in contact with electric wires in the public street, and *held*, the evidence was not conclusive that the derrick was placed in position and operated by independent contractors.

**Contributory Negligence.**

*Held*, the evidence was not conclusive that deceased was guilty of contributory negligence in attempting to push the loose part of a derrick cable, charged with electricity, from the open street into the gutter.

Action in the district court for Hennepin county by Susanna Klages, as administratrix of the estate of Herman Klages, deceased, to recover $5,000 for the death of plaintiff's intestate. The case was tried before Pond, J., who directed a verdict in favor of

1 Reported in 90 N. W. 1116.

defendant. From an order denying a motion for a new trial, plaintiff appealed. Reversed.

Young & Waite, for appellant.

James D. Armstrong, for respondent.

LEWIS, J.

The Gluek Brewing Company's buildings are situated on Marshall street, in Minneapolis, and the company entered into contracts for the construction of an addition to their refrigerator building. The dimensions of this new building were 100x100, varying in height from one story to eighty-six feet. Directly north of the space to be occupied by this building ran an alley fifty feet in width, which the company used in driving in and out in the conduct of its business; and immediately north of it was an ice house. The old and new buildings, as well as the ice house, faced east, flush with Marshall street; and to the west of the excavation, and between that and the river, was an open space of about seventy-five feet. On January 16, 1900, the brewing company entered into contracts with one Johnson for the masonry work, and with respondent for the structural and ornamental iron work, by the terms of which respondent agreed to furnish the material, and within six months to erect and complete its work, according to certain plans and specifications, for the consideration of $20,009.73. On June 4, 1900, respondent entered into the following contract with Winblad & Bruce:

"Gentlemen: We will pay you $3.60 per ton for the erection of the structural ironwork, not including stairs, on our order No. 131 for Gluek Brewing Company, you to erect same in a satisfactory manner, according to plans, to bolt all lintels together as required, and paint all material one coat when not already painted. It is understood that you are to take the material from the place where it is now piled. You are to make out your pay rolls, and we will pay the same on regular pay days at the office. If you want to discharge a man, we will pay him on presentation of regular discharge slip by you. It is understood that we are to furnish all tools and paint.          Yours truly,

"The Gillette-Herzog Mfg. Co.,
                    "By Peter Lees, Supt."

The brewing company obtained from the mayor a license or

permit to occupy for three months one-third of the street in front of the building to be erected for the disposition of building material, which stated that care be taken to incommode the public as little as may be during the construction of the building, and that the permit was granted upon the condition that proper guards would be placed around the material, and a suitable number of red lights kept burning through the nights to warn the public of danger, and that it was revocable at the mayor's pleasure.

On June 7, 1900, Winblad & Bruce began operations under their contract, selected their tools and derrick from respondent's supply, and respondent hauled the derrick to its indicated location near the southerly corner of the excavation, and not very far from the side of the street. A few feet to the southwest from it stood an electric pole, strung with wires belonging to the Minneapolis General Electric Company. Near the top of this pole were two cross-bars, one a little above the other; and the upper one, slightly lower than the top of the derrick, carried two "primary" and the lower one two "secondary" wires. On the day in question these primary wires were each charged with one thousand volts of electricity, and the secondary wires carried about one hundred eight volts. On the pole north, next to the one above described, was a "transformer," and one of the secondary wires went from this pole into the brewery for lighting purposes. The derrick was maintained in an upright position by four wire cables running north, south, east, and west, respectively, and these were fastened to an iron band at the top of the derrick mast by means of iron hooks. The north cable was fastened to the upper end of the ice house, about one hundred seventy-five feet from the derrick mast; the one to the east was made fast to a post in a vacant lot about seventy-five or eighty feet back from the street. The southern guy rope was fastened to a post directly in front of the south corner of the office, and a loose end extended northerly in the gutter some fifteen or twenty feet, and then curved back. The western cable had been pulled over the sidewalk primary wire and fastened to the window of the old malt kiln, and in operating the derrick it had come in contact with the primary wire, worn the insulator, and, as a consequence, that wire had become broken or

burned off. The electric company were notified of the fact, and had repaired the break and restrung the wire, raising it about six inches above the guy line, so as to remove the danger of further contact. But afterwards, in operating the derrick, this cable, which the testimony shows was very slack when the burned wire was repaired, had become taut, and again in contact with the primary wire, lifting it some five or six inches from its natural position. Such contact transmitted to all the cables of the derrick an electrical current, which rendered it unsafe and impossible to work with, and the electric company was informed of the situation, and requested to adjust the difficulty. But before imminent danger was apprehended, and about three o'clock in the afternoon on June 8, Johnson, one of the contractors, received a slight shock upon touching some part of the derrick, and from then on until about 5.30, when the accident here involved occurred, different persons received shocks upon contact with the derrick and certain charged portions of the ground near it.

Herman Klages was an engineer in the employ of the brewing company, and had charge of their electric lighting plant. About 5.30 o'clock he came out of the engine room, and joined the other men, and asked them what the matter was. One Proehl, who had just received a shock from the ground which threw him backward into the street, told him the ground and derrick were charged with electricity. The men then dared him to take hold of the cable, but he looked at the soles of his shoes, and said: "No, my feet are wet." "It wouldn't be dangerous. It is only one hundred eight or one hundred ten volts." He asked Proehl to show him the spot where he had received the shock, and when pointed out to him, warned Proehl, and a man standing with him, away from the place, saying: "It is kind of dangerous. You better step back." At this time Klages was informed that the electric company had been notified of the condition. He then went across the street, and returned with a stick or dry board some two and a half feet long and four inches wide, one end narrower than the other, with which he began to poke the loose part of the cable towards the sidewalk. By the "fooling" of the men it had been pushed some four or five feet into the street, and the end of it had come in contact with an

iron catch-basin cover in the gutter, thus causing occasional sparks. While he was thus pushing the loose part of the cable towards the gutter, the men watching him saw him suddenly make a movement as if he had slipped, and in flinging his arms out as if catching at something for support, his left hand came in contact with the cable, to which, a witness says, "he held on, and he gave a groan, and swung around and his neck or jaw came right across the guy." With some difficulty the men removed contact of the body with the cable, but death was conceded to have been instantaneous, and the result of an electric shock.

This action was brought for the purpose of recovering damages, on the theory that respondent was negligent in erecting and operating the derrick in a public street at a place contiguous to electric wires where persons having occasion to use the highway might come in contact with it. Respondent interposed the defense that it was not in charge of the derrick at the time of the accident, and that it was erected and operated by a firm of independent contractors, and that the deceased was guilty of contributory negligence. At the close of the evidence the court directed a verdict for defendant, and from an order denying plaintiff's motion for a new trial plaintiff appealed.

The order must be reversed, unless it conclusively appears that the work was done by independent contractors, and the relation of respondeat superior did not exist, or that deceased was guilty of contributory negligence. It was gross negligence to place the derrick in the public street with its metal cables contiguous to the electric wires, and to operate the same in lifting and swinging heavy iron beams so that contact was made in the manner stated. The inquiry is whether respondent was itself in charge of the work, or whether it had been unrestrictedly delegated to Winblad & Bruce.

In the case of Rait v. New England F. & C. Co., 66 Minn. 76, 68 N. W. 729, the following language was used:

"In every case the decisive question in determining whether the doctrine of respondeat superior applies is, had the defendant the right to control in the given particular the conduct of the person

doing the wrong? If he had, he is liable. On this question the contract under which the work was done must speak conclusively; in every case reference being had, of course, to surrounding circumstances."

And under the circumstances of the case it was left to the jury to determine whether the defendant surrendered all control over the manner of performing the work there under consideration.

In Barg v. Bousfield, 65 Minn. 355, 68 N. W. 45, the rule was declared as follows:

"Where one who performs work for another represents the will of that other, not only as to the result, but also as to the means by which that result is accomplished, he is not an independent contractor, but the agent of that other, who is responsible for his acts and omissions within the scope of his authority."

In the case of Whitson v. Ames, 68 Minn. 23, 70 N. W. 793, it was said:

"The decisive test in determining whether the doctrine of respondeat superior applies is whether the defendant had, under the contract of employment, the right to control in the given particular the conduct of the person doing the wrong."

In Vosbeck v. Kellogg, 78 Minn. 176, 80 N. W. 957, a written contract was construed, and held to show conclusively that the person in charge of the work was an independent contractor; but in that case that entire question was submitted upon the terms of the contract itself.

In Aldritt v. Gillette-Herzog Mnfg. Co., 85 Minn. 206, 88 N. W. 741, the rule is affirmed as stated in Rait v. New England F. & C. Co., supra, in the following language:

"The question whether the doctrine of respondeat superior applies to any particular case depends upon the question whether the original contractor had control of and the right to direct the subcontractor as to time, place, and manner of performing the work, and this question must be determined from the contract between the parties in the light of surrounding circumstances."

We think the contract, on its face, clearly indicates that respondent did not, in any respect, retain control of the work as to the method, time, or place of its execution, but only as to the

result accomplished, viz., that it should be in accordance with the specifications. But from a consideration of all the evidence surrounding the making of the contract we are of the opinion that it does not conclusively appear that the true relations of the parties were defined by the writing. At the time this contract was entered into, the ironwork to be put in place by Winblad & Bruce was lying in a vacant lot on the other side of the street opposite the building in which it was to be placed. For several reasons the best location for the derrick seemed to be in the street in front of the building, because the ironwork was nearer to that point than any other, the street was higher than the ground at the rear of the building, and the alley was hardly wide enough for the required purposes, and, besides, it was used by the brewing company in the daily conduct of its business. It was known to respondent that the street could not be occupied without securing a permit, and Winblad consulted respondent's superintendent in reference thereto. The contract provided that the men employed by Winblad & Bruce should be placed on the pay rolls of the respondent company, and that all tools and appliances were to be furnished by it, and the derrick was delivered in the street by respondent. The construction of the ornamental ironwork respondent reserved to itself, and on one occasion superintended and put in place certain iron plates, which was part of the work of Winblad & Bruce. It appears that Mr. Winblad had been a regular employee of respondent for about sixteen years, that he was accustomed to act as foreman of this kind of work, and had on several occasions during that period taken similar contracts to the one under consideration.

Under all of these circumstances we do not think it appears conclusively, as a matter of law, that respondent did not reserve the right of supervision as to time, place, and method of putting up the structural iron, and whether it did not in fact exercise supervision, to some extent, as to the use of the derrick, and its location with reference to the electric wires. If respondent did exercise such supervision, or if the contract was not intended to express the true relation between the parties in respect to the control or superintendence of the work, then Winblad & Bruce

were not independent contractors as defined by the decisions of this court. The case of Aldritt v. Gillette-Herzog Mnfg. Co., supra, involved a similar contract to the one under consideration, but the facts in that case were essentially different, and the decision rested upon the ground that the legal status of the parties was determined by the contract itself.

But respondent contends that the record conclusively shows that the deceased came to his death by reason of his own carelessness. The argument to this effect is based upon the fact that he had some experience as an electrician; that he knew contact existed between the derrick cable and the electric wire; that other people had received shocks by touching the cables, and that he was fully warned of the danger, so that his attempt to push the cable back towards the gutter was in a spirit of bravado or criminal carelessness, and not in the exercise of any duty devolving upon him.

A close examination of the evidence makes it by no means certain that deceased was not in the exercise of reasonable care, or that he was not acting in a commendable manner in attempting to move the cable to a less dangerous location. In the first place, his experience as an electrician was limited to the running of an ordinary dynamo. For some reason he assumed that it was one of the secondary wires, charged with one hundred eight or one hundred ten volts, which was in contact with the derrick. It does not appear conclusively that he was negligent in not knowing that it was the primary wire instead of the secondary. If he had been thoroughly familiar with the construction of the electric system, he would have known that the cable was in contact with the primary wire, and that the danger was greater; but he assumed that conditions were different, and that the cables were charged with one hundred eight or one hundred ten volts, which, it appears from the evidence, could not be fatal. When some one dared him to touch the cable, he refused upon the ground that his shoes were wet, but remarked that it would not be dangerous, which tended to show precaution upon his part. It is true he had been informed that the electric company had been notified of the condition, but there is no evidence as to what time they were expected to make

86 M.—30

the repairs, and that fact alone is not sufficient to warrant the conclusion that the deceased was simply playing with an instrument of death.    It is urged that there was no duty resting upon him to go into the street and interfere with the cable, and that by so doing he assumed the risk, and was alone responsible for the result.    True, he was not, in the ordinary sense, a traveler along the public highway at that time, for it may be said that he was attracted to the place by the fact that the derrick had become charged with electricity; but he had a right to be in the street, not only as a public traveler, but also for the purpose of observing what was going on; and, if a traveler would have the right to stop and remove from the highway a nuisance which he conceived to be dangerous to other travelers, then the deceased had a similar right to remove a dangerous instrument which came under his observation, although he was attracted to the place by the very fact of its existence.

In the case of Dillon v. Allegheny, 179 Pa. St. 482, 36 Atl. 164, it was held that a police officer was justified in attempting to remove a live electric wire from the public street with his mace.    The decision does not necessarily rest upon the fact that he was a public officer whose particular business it was to remove such dangerous appliances.    If a patrolman would be justified in so doing, then any person, with reasonable care and caution, may do the same thing.    In the case of Bourget v. City, 156 Mass. 391, 31 N. E. 390, it was held that one who was traveling in the highway was justified in attempting to remove a loose telephone wire; and, while the opinion in that case discusses the question from the standpoint of a traveler, it is clearly stated that the attempt to remove the wire was justified, in that it did not appear to be an intermeddling by a volunteer.    In Texarkana v. Orr, 59 Ark. 215, 27 S. W. 66, it was held to be a question for the jury whether a boy, who had been warned, was guilty of contributory negligence in picking up a live wire that was lying across the street.    The case should have been submitted to the jury.

Order reversed, and a new trial directed.

COLLINS, J. (dissenting).

I cannot concur in the conclusion that Mr. Klages was not guilty of contributory negligence which caused his death. He left his work out of curiosity, went into the street, was told of the danger, fully realized it, decided to let the wire cable alone, went away, then returned, and, without having any duty to perform, attempted to move it to one side, simply, in my judgment, because he had previously been dared to handle it by his fellow workmen, who were standing by in sufficient numbers to warn and protect travelers on the street, if there were any,—of which there was no proof, and no presumption, because of the torn-up condition of both wagon track and sidewalk. If this was not gross carelessness and negligence, I cannot imagine what is, and therefore dissent.