## ORVAL ERICKSON v. HAROLD QUARSTAD AND ANOTHER.

132 N. W. (2d) 814.

December 31, 1964—No. 39,353.

*Clifford G. Nelson,* for appellants.

*O'Brien, Ehrick & Wolf, R. V. Ehrick,* and *Michael Berens,* for respondent.

NELSON, JUSTICE.

This action was brought by plaintiff to recover damages for the loss of part of the fingers of his left hand in an accident which occurred October 25, 1960, while he was using a hydraulic hoist on a farm owned by defendants Harold and Arthur Quarstad. Also named as a defendant was Van Web Equipment Company, which plaintiff claimed had designed and manufactured the hoist, but the action was dismissed as to this defendant at the close of plaintiff's testimony.

At the time of the accident plaintiff was a farmer in Pilot Mound Township, near Chatfield, Minnesota, was 39 years of age, and had farmed all of his life except for 3 years spent in the Air Force as a B-24 bomber engine mechanic. He was thus familiar with all types of the usual farm machinery and had become familiar with the use of hoists and derricks while working on the bomber engines. He had been farming on his own from 1947 until the date of the accident.

Plaintiff had known defendants Quarstad all of his life. They lived in the same vicinity and had regularly exchanged farm work and the use of equipment at cornpicking and other times. The exchange arrangement did not involve the payment of money.

On the day preceding the accident the Quarstads had helped

pick corn on plaintiff's farm. On the date of the accident they had moved their equipment to their own farm for the same purpose, and at the time of the accident defendant Harold Quarstad was in the field picking corn, while his brother Clarence and plaintiff were at the elevator emptying a box of corn. The dimensions of the box in which the corn was hauled were 6 feet by 12 feet, and it was set on the top of a 4-wheel, rubber-tired farm wagon. The unloading operation required the front of the box to be lifted so that the corn would slide out a door in the rear of the box. The box was raised by means of the hydraulic hoist or jack, which the Quarstads had acquired at a farm sale in 1957 and had used continuously since then in doing exchange work with neighbors in the locality, including plaintiff.

The jack consisted basically of an A-frame with a hydraulic cylinder fastened in a vertical position from the horizontal crossbar, the overall height of the A-frame being 59¼ inches and the width between the outside of its legs at the base 25 inches. The top of the crossbar was 29¼ inches above the ground. A pulley was mounted on the top of the hydraulic cylinder, and a cable was fastened to the outer cylinder, strung through the pulley, and attached to the object to be lifted—here, the box of corn which was to be emptied into the elevator. The vertical cylinder actually consisted of two cylinders, the outer one containing hydraulic fluid and the inner containing a piston which was raised when the fluid was forced into the inner cylinder by a small hand pump attached to the exterior of the outer cylinder. The piston was released from a raised position by a mechanical valve which, when actuated, allowed the fluid to return to the outer cylinder. Raising or lowering the piston raised or lowered the pulley also. The jack had been so pumped just prior to the accident to discharge the corn into the elevator.

There is a conflict in the testimony as to who raised the box the morning the accident occurred. When the box was emptied and Clarence Quarstad was picking up corn which had spilled on the ground, plaintiff turned the release valve to lower the box. The piston, however, dropped only an inch or less. According to his testimony the plaintiff then looked at the jack to determine why it had not come

down. A moment later the piston dropped and plaintiff's left hand, which was between the cable and the pulley, was drawn into the pulley and his fingers were partially severed. Plaintiff says he does not know how his hand got on or under the cable. The only explanation he appears to offer is that he must have placed it there unconsciously. There is testimony that the day before the accident the jack had been used in the same manner on plaintiff's farm for similar purposes, but he asserts that his brother operated it and that he had nothing to do with it. He also testified that he had not previously used this particular jack but had used a similar one on three or four prior occasions and had observed this jack in operation once or twice before. He claims that no one instructed him concerning its use.

It is undisputed that the jack had been used in grain and corn harvesting from the time of its purchase to the time of trial, and that this use had involved much exchange work between defendants and their neighbors, including plaintiff. Harold Quarstad testified that in his opinion the jack had been operated approximately 600 times prior to the accident and that he had not experienced any difficulty with the jack itself. He said that on one occasion when another farmer was using it the U-clamp holding the hook on the end of the cable had loosened and the hook had come off. He also indicated that occasionally when a wagon box was being lowered it would lodge on top of the bolster stakes on the wagon and that this would necessitate jarring the wagon box or raising the jack so as to place the wagon box stringers back between the bolster stakes.

Plaintiff, under cross-examination, admitted that he knew that opening the release valve would cause the piston to drop and that his hands were in no danger when he opened the valve. He refused to admit that he had put his hand under the cable. When his deposition was taken he admitted that he knew he had put his hand in a dangerous place but said that he did not intentionally put his hand under the cable. On cross-examination he said that he would not have put his hand under the cable had he been aware of what he was doing. He gave the following testimony at the end of his cross-examination:

"Q. Now, I'll ask you, up until the time you put your hand up there under the cable—

"A. I did not intentionally put my hand under the cable.

"Q. Just let me finish the question. Up until the time you put your hand up there under the cable and the pulley, there was nothing to hurt your hand?

"A. I didn't say I put my hand up under there.

"Q. But your hand was there?

"A. Yes.

"Q. And your hand didn't get hurt until you put it up there?

"A. I didn't say I put it up there. I don't know how it got there.

"Q. Now, at the time this accident happened Clarence was out behind the wagon?

"A. Yes.

"Q. And Harold Quarstad was somewhere out in the corn field?

"A. Right."

On direct, plaintiff testified on the same point as follows:

"Q. Did you take hold of any part of this jack?

"A. Not that I recall.

"Q. Did you put your hand on the cable?

"A. I don't recall doing it.

"Q. May you have put your hand on the cable?

"A. It's possible, I just don't remember.

"Q. Did you put your hand on the piston?

"A. I don't—I just can't remember.

"Q. May you have put your hand on the piston?

"A. It's possible, yes.

"Q. You may have but you can't recall at this time exactly where your hand was?

"A. That's right.

"Q. Orval, did you at any time, while you were observing this situation, shake this cable or push the box or hit the jack in any way to loosen it?

"A. No.

"Q. Is there any question in your mind about this?

"A. No."

With respect to handling the type of jack used on the day of the accident, plaintiff testified on cross-examination:

"Q. Well, now, Mr. Erickson, you knew how to handle this type of jack there on the day of the accident, didn't you?

"A. I thought I did.

"Q. And you didn't have to ask anybody how to handle it, did you?

"A. I didn't think I did, no.

"Q. And that was because you thought you knew how to handle it?

"A. Well, I was reasonably sure I knew how to operate it.

"Q. Well, are we to understand now that you have changed your mind about whether you knew how to operate it or not?

"A. No.

"Q. You are telling this jury that you still know how to operate it?

"A. I think I can, yes.

"Q. And that's based on your experience and knowledge of this type of equipment?

"A. Yes.

"Q. And this jack here?

"A. Jacks like that, yes."

Two witnesses for plaintiff, neighbors of defendants, testified that they each had had one experience in the past with the piston sticking when it was jacked up. Both said they alleviated the difficulty by jerking the cable. Neither of those witnesses knew whether they had told the Quarstads of their experience, and defendants Quarstad assert that they had not.

Professor Adolph O. Lee, an assistant professor in mechanical engineering at the University of Minnesota, and a registered mechanical engineer, testified as an expert for plaintiff. As we read the record, the effort to prove by this expert witness that the jack was worn and would therefore bind at some point led nowhere. Although he testified to that effect on direct examination, the witness admitted under cross-

examination that the jack was so constructed as to avoid the piston's being forced out to a point where it would bind in the cylinder. He admitted that the only time he had obtained that condition during his examination of the jack was when he filled the oil reservoir beyond its capacity and then operated the jack without any weight on it so that the fluid was not forced back into the outer cylinder through the safety hole near the top of the inner cylinder, but instead caused the piston to be forced completely out of the cylinder. It is self-evident that the safety feature would not work unless there was pressure on the piston so as to force the oil into the bypass hole. However, Professor Lee did not discover this safety device until the day before he testified. The record indicates that he first examined the jack about 8 months subsequent to the accident and then concluded that the piston was worn and therefore had leaned to one side in the cylinder, resulting in a binding condition. He admitted also that he did not know the original dimensions of the piston and therefore was unable to determine to what degree the piston had actually been worn.

When plaintiff rested, defendants moved for a dismissal under Rule 41.02, Rules of Civil Procedure. Again, when the evidence was all in, defendants renewed that motion and also moved for a directed verdict. After the return of the jury verdict in plaintiff's favor, defendants moved for judgment notwithstanding the verdict or, in the alternative, for a new trial. They appeal from the order denying this motion.

On appeal they contend that the trial court erred in denying their motions for dismissal and in denying their motion for a directed verdict, which had been made on the grounds that the evidence was insufficient to establish negligence against defendants and that plaintiff was himself guilty of contributory negligence and assumption of risk as a matter of law. They also contend that the trial court erred in refusing to instruct the jury on assumption of risk; in instructing the jury on the emergency doctrine; and in denying their motion for judgment notwithstanding the verdict or for a new trial, which had been based on the insufficiency of the evidence to establish negligence on the part of defendants as the proximate cause of the accident.

1-2. Negligence is commonly defined in this state as the doing of something which an ordinarily prudent person would not do or the failure to do something which an ordinarily prudent person would do under like or similar circumstances. 13B Dunnell, Dig. (3 ed.) § 6969, and cases cited.

A careful consideration of the evidence discloses that plaintiff was reluctant to admit that he ever put his hand in a position of danger. Generally, his testimony is clearly to the effect that he did not know where his hands were or how his left hand came into contact with the cable. His only testimony admitting that he actually touched the jack is that he turned its release valve to let down the wagon box which had been raised for unloading. He testified that the piston went down only a fraction of an inch upon being released, but that at no time while observing the situation did he shake the cable or push the box or hit the jack in any way to loosen it, and that he did not recall taking hold of any part of the jack or putting his hand on the cable.

As plaintiff stood beside the jack after he had opened the release valve, he was in no danger. He insists that whatever his subsequent movements may have been, the accident was due to negligence on the part of defendants. However, the only possible inference to be drawn from the undisputed fact that plaintiff's hand was injured by the cable and pulley is that he placed his hand on or under the cable and was injured because he did so. His action in doing so, even if it was unintentional, was clearly negligent. While the jack involved here was not a simple tool, such as a hammer, nevertheless its working would be familiar to automobile drivers and to a man familiar with all the ordinary types of farm equipment and machinery, as plaintiff was.

A proximate cause is one in which is involved the idea of necessity. After the equipment "hung up" following the release of the valve, what plaintiff did and what occurred from that point on was wholly a matter of his conduct alone. He does not claim that anyone else put his hand under the cable which caused the injury. He simply says he does not know how it got there. While proximate cause of an injury is ordinarily a question for the jury, it is not when the facts are undis-

puted and only one inference can be drawn from them. Such a situation clearly presents a question for the court to determine as a matter of law. Here it appears as a matter of law that plaintiff was negligent and that his negligence was the proximate cause of his injury.

It is clear also that the emergency doctrine was not applicable in this case since it may properly be applied only if there is an emergency and the negligence of the party seeking to invoke the rule was not a contributing cause. See, 13B Dunnell, Dig. (3 ed.) § 6972a.

3-4. It is clear also that plaintiff assumed the risk of injury as a matter of law.

It is the general rule that a person engaging in any employment assumes the obvious risks ordinarily incident to it. Of course, if a servant is ignorant of defects in the equipment furnished him, and justifiably so, there can be no assumption of risk. Geis v. Hodgman, 255 Minn. 1, 95 N. W. (2d) 311; Syverson v. Nelson, 245 Minn. 63, 70 N. W. (2d) 880; Scharenbroich v. St. Cloud Fiber-Ware Co. 59 Minn. 116, 60 N. W. 1093. Under the doctrine of assumption of risk as applied in this state, a servant also assumes such extraordinary risks incident to his employment as he may knowingly and voluntarily encounter. The danger, however, must be known or plainly observable by him since the measure of his duty is that of ordinary observation. Rase v. Minneapolis, St. P. & S. S. M. Ry. Co. 107 Minn. 260, 120 N. W. 360, 21 L. R. A. (N.S.) 138.

The facts in the instant case do not disclose any hidden defect in the machinery involved of which defendants had knowledge and plaintiff did not. Plaintiff admits that he had operated and was familiar with jacks similar to defendants' jack, as well as other farm machinery and equipment. It appears that he could see and appreciate the danger as well as defendants could. His knowledge of machinery appears to be even more extensive than theirs. Whatever method he chose to set the jack in motion after it stalled involved placing his hand in a position which to a man of his experience was obviously one of danger. If he could see and appreciate the danger, he assumed the risk as a matter of law. Liptak v. Karsner, 208 Minn. 168, 293 N. W. 612. We held in the Liptak case that where the danger is

obvious to the sense of ordinary intelligence and discernible or patent to the employee, the employer is under no duty to instruct or warn concerning it, and that where a condition of danger is obvious, known to, and appreciated by the employee, and he continues to work without protest, the risk of danger is assumed by him. See, Rozinka v. Duluth & I. R. R. Co. 181 Minn. 20, 231 N. W. 404; Palmer v. Wiltse, 239 Minn. 130, 57 N. W. (2d) 812; Hermann v. Clark, 89 Minn. 132, 94 N. W. 436; Anderson v. C. N. Nelson Lbr. Co. 67 Minn. 79, 69 N. W. 630.[1]

5. This court has quite uniformly applied the rule stated in Geis v. Hodgman, *supra*, that whether a person assumed the risk of a given situation is a question for the jury unless the evidence is conclusive. We think that in this case the evidence has that character. It is practically impossible to conceive of anything which anyone could have told the plaintiff about either the situation or the risks incident to it which was not patent to the senses, in the exercise of common observation, by a man of his long experience with machinery and his intelligence.

Had this case turned exclusively upon the question of whether the defendants were negligent in having furnished a defective instrumentality of a character not obvious to ordinary observation, it would undoubtedly be a proper case for submission to a jury. The servant assumes the risk if the servant as well as the master can see and appreciate the danger.

Assumption of risk, however, is to be distinguished from contributory negligence in that notice or knowledge of the appreciation of danger is indispensable to the former, while contributory negligence is based on carelessness. Assumption of risk must also be voluntary.

---

[1]Other jurisdictions under facts similar to those in the instant case have held that the servant assumes the risk if the danger is obvious to an ordinarily prudent person even though the master is negligent. Hopper v. Gallant, 46 Wash. (2d) 552, 282 P. (2d) 1049; Blanco v. Sun Ranches, Inc. 38 Wash. (2d) 894, 234 P. (2d) 499, 235 P. (2d) 830; Schmeling v. Jorgensen, 77 S. D. 8, 84 N. W. (2d) 558. See, Restatement, Agency (2d) § 521; 35 Am. Jur., Master and Servant, § 302; 56 C. J. S., Master and Servant, § 393. See, also, the excellent annotation in 67 A. L. R. (2d) 1120 on liability of a master to a servant injured by farm machinery.

The elements of contributory negligence are want of ordinary care on the part of an injured person and a causal connection between his conduct and the accident, while assumption of risk requires, in addition, voluntary assumption. Therefore, a party who has more than one way in which to do an act, and who knows that one is safe and the other dangerous and nevertheless elects the dangerous one, is guilty of assumption of risk, and a party who places himself in a position to encounter known hazards which the ordinarily prudent person would not do is guilty of contributory negligence.

In Westcott v. Chicago G. W. R. Co. 157 Minn. 325, 196 N. W. 272, this court said that the defenses of contributory negligence and assumption of risk are separate and distinct; that the first involves the notion of carelessness, while the second does not; and that in some fact situations both may be available. Dean William L. Prosser explains the difference between assumption of risk and contributory negligence as—

"* * * one between risks which were in fact known to the plaintiff, or so obvious that he must be taken to have known of them, and risks which he merely might have discovered by the exercise of ordinary care." Prosser, Torts (2 ed.) p. 305.

6. We must conclude upon the record and under the cases cited herein that whatever plaintiff did in bringing on his injury can be attributed only to his own conduct for which he and he alone was solely responsible and that his contributory negligence and assumption of risk appear as a matter of law. Defendants are therefore entitled to judgment notwithstanding the verdict.

Reversed.

UPON APPEAL FROM CLERK'S TAXATION OF COSTS.

On January 29, 1965, the following opinion was filed:

PER CURIAM.

Respondent challenges the taxation of $68.85 of the total of $680.70 designated as the disbursement for the printing of the record. The $68.85 is disallowed, since the briefs herein fail to show any purpose in making the final arguments a part of the printed record.

The motion for a new trial was made before the trial judge on the minutes of the court. Thus it is clear that the transcript was ordered and prepared exclusively for use on appeal and therefore it may properly be taxed and allowed in this court in the amount of $265.50 as stated in the affidavit of disbursements and notice of taxation of costs. See, State ex rel. Wrabek v. Tifft, 185 Minn. 103, 240 N. W. 354; Larson v. Tweten, 185 Minn. 652, 242 N. W. 378, and cases therein cited.