SHIRLEY RAUSCH, TRUSTEE FOR SURVIVING SPOUSE AND NEXT OF KIN OF DONALD RAUSCH, v. JULIUS B. NELSON AND SONS, INC., AND ANOTHER.

149 N. W. (2d) 1.

February 3, 1967—No. 40,060.

*Byron W. McCullagh,* for appellant.

*Peterson & Holtze* and *Robert C. Holtze,* for respondent Julius B. Nelson and Sons, Inc.

*Meagher, Geer, Markham & Anderson, O. C. Adamson II,* and *Mary Jeanne Coyne,* for respondent Adolfson and Peterson, Inc.

NELSON, JUSTICE.

In this action for death by wrongful act, there was a jury verdict for plaintiff against both defendants. Plaintiff appeals from an order setting aside the verdict and granting judgment in favor of defendants. The trial court held that the conduct of the decedent in voluntarily exposing himself to a known or obvious hazard which the ordinarily prudent person would not do required findings that decedent was guilty of assumption of risk and contributory negligence as a matter of law and that his conduct was the proximate cause of his death.

The fatal accident which resulted in this litigation occurred during the

construction of the Nine Mile Creek School in the city of Bloomington, Minnesota. The general construction contractor for this school was defendant Adolfson and Peterson, Inc., hereinafter referred to as A & P. A & P subcontracted the painting and decorating to defendant Julius B. Nelson and Sons, Inc., hereinafter referred to as Nelson. Separate contracts were made by the school district with another contractor for the mechanical work and with Tieso Electric Company for the electrical wiring. Tieso's foreman was Donald Rausch, plaintiff's decedent, who had been employed by Tieso for 7 or 8 years. Another employee of Tieso, who was subordinate to decedent, was Arthur Brophy.

There is very little dispute as to the basic facts. As the building neared completion, some 90 doors were delivered and placed in the school's auditorium. These doors were approximately 3 x 7 feet in size, 2 inches thick, and weighed about 90 pounds each. Nelson was notified of their arrival since it had the job of staining and sealing the doors and the frames in which the doors were to be hung. James Nelson, Nelson's chief executive officer, determined the method of performance of the painting contract and coordinated Nelson's activities with those of the other contracting trades. On Monday, June 25, 1962, two of Nelson's employees stained the doors. When each door had been stained, it was placed upright with a top corner touching the north wall of the auditorium and a lower corner as near the wall as possible. A space of about 8 inches was left between the doors as they were so placed. Stacking of doors in this manner is customarily done to facilitate proper drying, especially in hot and muggy weather. After the doors were stained, they were then sealed and again placed against the north wall in the same manner and for the same reason. The doors stood in that position without difficulty from Monday until late Wednesday afternoon.

The painters completed their work on the doors about 1:30 p. m. Tuesday. On Wednesday morning, June 27, they began painting the door frames preparatory to installation of the doors. The doors could not be hung until the frames were dry, so the carpenters were scheduled to hang the doors on Thursday morning.

Late Wednesday afternoon plaintiff's decedent, Donald Rausch, decided that he wanted to feed wires from one electrical box to another in

the auditorium where the doors had been stacked. One of these boxes was in the wall behind the stacked doors and the other box was located just beyond the row of doors. Rausch asked Joseph Scott, A & P's foreman, to remove the doors. Scott informed Rausch that there was not time to move them that afternoon but that they would be moved the next day, Thursday. Rausch, nevertheless, decided to go ahead and to work in the midst of the stacked doors. He and his helper, Arthur Brophy, decided on their own to remove the doors in front of the box, each carrying one door away. The space left by the removal of these two doors made an opening 23 to 27 inches wide between the angled standing doors.

Rausch went into the opening they had created in the row of doors and pushed a "fish tape" into the box and through the conduit embedded in the wall to the other box, where Brophy was waiting. Brophy then left the auditorium to obtain the proper electrical wires which they were about to use. When Brophy returned he found that Rausch had moved to the box where Brophy had been, so Brophy went to the opening in the row of doors, attached two electrical wires to a hook at the end of the "fish tape," and began feeding the wires through the box into the conduit while Rausch pulled the "fish tape" out of the other box. In order to do this Brophy, on one knee, crouched down to the box, which was 14 inches above the floor, and pushed the wires, draped over his shoulder, into the box while Rausch pulled at the other end. Brophy's shoulders were in the narrow oblique opening between the doors and his hands were about 14 inches from the box in the wall.

After about 10 feet of wire had been fed into the box, the door adjacent to Brophy began to fall, striking the door next to it, which in turn struck the one next to it, and so on, domino fashion, with the result that some 43 doors fell. Rausch was struck by the last door in the row and received fatal injuries.

At the trial Brophy first stated that neither he nor the wires touched the doors, and he also said that he could not recollect having said that the wires hit the doors. Later, however, he admitted signing and initialing a statement and further testified that the statement was true and accurate when given. In the statement Brophy had declared that the wire became difficult to pull, there was a jerk of the wire, following which the

wire behind him hit the door and caused it and the rest of the row of doors to fall in Rausch's direction.

After this portion of his statement had been read to him, Brophy was asked whether the report he gave was a correct description of the facts as he had them in mind when he gave the statement, to which he answered, "As I remember them, yes, I suppose." He later admitted that the jerk of the wire on his shoulders "may have" caused the doors to fall and reiterated that in doing what he did he was following decedent's instructions.

The record also reveals that defendant A & P, the general construction contractor, did not have general supervision over the premises, nor was it in control of them, although it would require trespassers to leave. Its responsibility was to see that the work progressed properly. It notified the subcontractors when to begin, but the subcontractors determined their own work methods and procedures. The various prime contractors kept in touch with each other to determine the progress of the work but each prime contractor determined the methods of accomplishing its work and came and went as it pleased. Thus no one contractor had any right to supervision or control over the project or over other contractors.

The ultimate question before the court on this appeal is the propriety of the trial court's order granting judgment non obstante. It is clear that under certain circumstances judgment notwithstanding the verdict may properly be ordered.

"* * * A verdict may be directed only in those unequivocal cases where it clearly appears to the court on the trial that it would be its manifest duty to set aside a contrary verdict as not justified by the evidence or as contrary to the law applicable to the case. * * * Though the evidence on the part of the plaintiff standing alone would justify submitting a case to the jury, yet the court should direct a verdict for the defendant if, upon all the evidence, it would be its manifest duty to set aside a verdict against him. In other words, the court should direct a verdict in favor of a party in whose favor the evidence overwhelmingly preponderates, though there is some evidence in favor of the adverse party." 19 Dunnell, Dig. (3 ed.) § 9764.

In Yates v. Gamble, 198 Minn. 7, 15, 268 N. W. 670, 674, we concisely said:

"The court should direct a verdict for defendant if upon all the evidence it would be the manifest duty of the court to set aside a verdict against him. Giermann v. St. P. M. & M. Ry. Co. 42 Minn. 5, 43 N. W. 483; Pennsylvania R. Co. v. Chamberlain, 288 U. S. 333, 53 S. Ct. 391, 77 L. ed. 819."

Mr. Justice Matson, speaking for this court in Cofran v. Swanman, 225 Minn. 40, 42, 29 N. W. (2d) 448, 450, said:

"A motion for judgment *non obstante* accepts the view of the evidence most favorable to the verdict and admits every inference reasonably to be drawn from such evidence, as well as the credibility of the testimony for the adverse party, and if the application of this rule, in the light of the evidence as a whole, discloses a reasonable basis for the verdict, the motion must be denied. [Citations omitted.]

\* \* \* \* \*

"\* \* \* If, however, upon a search of the entire record, after taking the evidence in the light most favorable to the verdict and giving the adverse party the benefit of every inference reasonably deducible therefrom, the evidence as a whole manifestly and so overwhelmingly preponderates to the contrary as to be practically conclusive against the verdict, the motion for judgment *non obstante* should be granted. \* \* \*

"\* \* \* If the undisputed or conclusively shown physical facts negate the truthfulness or reliability of the testimony upon which a verdict is based, the verdict is without foundation and must be set aside."

■ Plaintiff, however, contends that the trial court erred in setting aside the verdict against both defendants and granting judgment in their favor. She argues that the rule applicable to the facts here is that stated in 13B Dunnell, Dig. (3 ed.) § 6975:

"Where several persons are engaged in the same work, in which the negligent or unskillful performance of his part by one may cause danger to the others, and in which each must necessarily depend for his safety upon the good faith, skill, and prudence of each of the others in doing

his part of the work, it is the duty of each to the others engaged on the work to exercise the care and skill ordinarily employed by prudent men in similar circumstances, and he is liable for any injury occurring to any one of the others by reason of a neglect to use such care and skill. A general contractor in charge of a building in the course of construction, knowing that workmen of other contractors are working in or about the building, is bound to exercise reasonable care to avoid injuring them."

Plaintiff cites Builders & Mfrs. Mutual Cas. Co. v. Butler Bros. Bldg. Co. 192 Minn. 254, 255 N. W. 851, as having adopted that rule and also as supporting her contention that the negligence of the defendants and the contributory negligence of plaintiff's decedent and his coworker were properly submitted to the jury as fact issues. Plaintiff also cites Restatement, Torts (2d) § 414, comment *b*, as imposing liability on defendant A & P.

Plaintiff also relies on Article 12 of the General Conditions of the contract between A & P and the school district. That article provides in part:

"The Contractor shall take all necessary precautions for the safety of employees on the work, and shall comply with all applicable provisions of Federal, State, and Municipal safety laws and building codes to prevent accidents or injury to persons on, about or adjacent to the premises where the work is being performed. He shall erect and properly maintain at all times, as required by the conditions and progress of the work, all necessary safeguards for the protection of workmen and the public * * *."

We think it obvious that A & P had nothing whatsoever to do with painting, sealing, or stacking the doors. Plaintiff does not claim that A & P is liable by reason of its own conduct. Plaintiff's claim is that A & P is liable because it is responsible for the acts of the others. Plaintiff ignores the facts that A & P was not the sole prime contractor in the instant case; it was not the only contractor who had a contract with the owner; and each prime contractor—the construction contractor, A & P, the electrical contractor, Tieso Electric Company, and the mechanical contractor—was a general contractor, but only in respect to that part of

the work involved in his separate contract. The relationship between these contractors was, therefore, that of cocontractors. There was no one general contractor responsible for the entire job. Thus, one of the specific issues presented by this case is whether direct liability may be imposed on one prime contractor with respect to injury to an employee of another prime contractor by virtue of the contract between the former contractor and the owner.

It is the general rule that contract provisions do not create duties to strangers to the contract. The law on that issue is summarized in Goar v. Village of Stephen, 157 Minn. 228, 235, 196 N. W. 171, 174, where we said:

"The case must be decided by rules of negligence. The law of contract has no application. The liability for negligence ordinarily is 'independent of any contractual relation.' Krahn v. J. L. Owens Co. 125 Minn. 33, 145 N. W. 626, 51 L. R. A. (N. S.) 650. As there stated, 'a duty with respect to instrumentalities delivered under contract may exist towards others than the contracting parties.' But that duty does not arise from the contract. It arises, rather, from the obligation imposed by law to use due care for the protection of others."[1]

Moreover, the record is clear that the issue of negligent breach of contract was not submitted to the jury. The trial court's instructions did not permit the jury to impose liability on A & P for any alleged breach of its contract with the school district. Instead, the court submitted only the issue of common-law negligence. Since plaintiff's verdict does not rest upon any contract theory of liability, plaintiff will not be permitted to raise any such theory on appeal.

■ With respect to what common-law duty defendants owed decedent, it is significant that even a general contractor is not liable for the negligent acts and omissions of his subcontractor unless the right of the former to control or supervise the latter as to time, place, and manner of performing the work exists by force of the contract between them,

---

[1] See, O'Brien v. American Bridge Co. 110 Minn. 364, 125 N. W. 1012, 32 L. R. A. (N. S.) 980; 13B Dunnell, Dig. (3 ed.) § 6995a; Foster v. Herbison Const. Co. 263 Minn. 63, 115 N. W. (2d) 915.

as interpreted in the light of all the surrounding circumstances, or unless the duty to assume such control and supervision is imposed, as a matter of law, by reason of some peculiar relation which the person for whom the work is being performed bears to third persons as to the time, place, or manner of performance. Mix v. City of Minneapolis, 219 Minn. 389, 18 N. W. (2d) 130; Klages v. Gillette-Herzog Mfg. Co. 86 Minn. 458, 90 N. W. 1116; Harper, Law of Torts, § 292; Restatement, Torts (2d) § 414. In the instant case the evidence shows that defendant A & P had no right to exercise control with respect to the day-to-day manner in which Nelson performed the painting work. The sole obligation of A & P was to see that the painting contractor's work conformed to the plans and specifications.

In Federal Cement Tile Co. v. Henning (8 Cir.) 32 F. (2d) 163, an instruction that a sole general contractor would not be liable to a subcontractor's employee injured because of a defective scaffold if the employee had not gone onto the scaffold in connection with the business of the contractor was approved. It cannot be contended in this case that decedent was helping either of defendants in the performance of their work. Since decedent had been informed that the doors could not be moved until the next morning, it could be said that he was officiously and without authority meddling with the painting contractor's project. There is nothing in the record to indicate that any emergency existed requiring the installation of the electrical outlet that particular day, as distinguished from the following day, so as to justify an invasion by the electrical contractor's employee of the painting contractor's setup. Decedent was not where he was at the time of the accident in connection with the business of either of defendants.

As heretofore pointed out, defendant A & P was not a sole general contractor under whose general supervision decedent was working. A & P and decedent's employer were both prime contractors. Thus, defendants had no duty affirmatively to make the premises safe for the employees of other cocontractors. They did not invite decedent to work there. He was not injured while performing defendants' work or using their equipment. The area was patently not ready for operations by decedent's employer. The only duty which the defendants owed decedent was to

warn him of dangerous conditions which they had reason to believe that he would not discover.[2]

Further, as pointed out by the trial court in its memorandum, the alleged obligation to warn was superfluous because the fact that stacked objects can fall was as obvious to decedent as it was to anyone else. See Dishington v. A. W. Kuettel & Sons, Inc. 255 Minn. 325, 96 N. W. (2d) 684, in which an employee of the owner of the premises under construction was injured while venturing into an area where a subcontractor's employees had stacked large sheets of sheet metal. This court has said repeatedly that the operation of the law of gravity is a matter of such common knowledge that all persons of ordinary intelligence and judgment, even if they are illiterate, are required to take notice of it and that, therefore, there is no duty to warn against dangers which are obvious. Blomberg v. Trupukka, 210 Minn. 523, 299 N. W. 11.

We have quite uniformly applied the rule that whether a person assumed the risk of a given situation is a question for the jury *unless the evidence is conclusive.* Here, the evidence has that character. It is practically impossible to conceive of anything which anyone could have told decedent about either the situation or the risks incident to it which would not have been patent to the senses in the exercise of common observation by a man of his intelligence and long experience. See, Geis v. Hodgman, 255 Minn. 1, 95 N. W. (2d) 311; Syverson v. Nelson, 245 Minn. 63, 70 N. W. (2d) 880; Erickson v. Quarstad, 270 Minn. 42, 132 N. W. (2d) 814.

The undisputed physical facts and the manner in which the accident happened establish that it was caused by the negligence of decedent and Brophy and that decedent assumed the risk of injury. We must agree with the analysis of the trial court in a memorandum made a part of the order granting judgment notwithstanding the verdict:

"Deceased was a foreman and a man with some considerable experience around building projects. He should have seen what was obvious, but nevertheless he chose to assume the risk. Therefore this Court must hold that deceased's negligence and that of his helper Brophy was the

---

[2] The general rule is summarized in 57 C. J. S., Master and Servant, § 610.

proximate cause of the accident, and the verdict in favor of the plaintiff must be set aside and judgment granted in favor of the defendants."

Affirmed.

MR. JUSTICE PETERSON, not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.